2013-5094

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

LAKESHORE ENGINEERING SERVICES, INC.

Plaintiff-Appellant

v.

UNITED STATES,

Defendant-Appellee

---

On Appeal from the United States Court of Federal Claims
Cause No.: 09-CV-0865, Judge Francis M. Allegra

---

## CORRECTED BRIEF OF APPELLANT LAKESHORE ENGINEERING SERVICES, INC.

---

PHIL B. ABERNETHY
LEANN W. NEALEY
BUTLER, SNOW, O'MARA, STEVENS
   & CANNADA, PLLC
1020 Highland Colony Pkwy, Suite 1400
Ridgeland, Mississippi  39157
T:  (601) 948-5711

*Counsel for Appellant*

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Lakeshore Engineering Services, Inc.    v. United States

No. 2013-5094

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant, Lakeshore Engineering certifies the following (use "None" if applicable; use if necessary):

1.      The full name of every party or amicus represented by me is:

Lakeshore Engineering Services, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Same

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Lakeshore Engineering Services, Inc. is wholly owned by Lakeshore Toltest Corporation, a privately held Delaware corporation.  There are no publicly held companies that own 10% or more of the stock of Lakeshore Engineering Service, Inc.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Butler Snow O'Mara Stevens & Cannada, PLLC, Phil B. Abernethy, LeAnn W. Nealey

08/07/2013                           /s/ LeAnn W. Nealey
        Date                                   Signature of counsel

                                        LeAnn W. Nealey
                                        Printed name of counsel

Please Note: All questions must be answered
cc:

i

124

2013-5094

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LAKESHORE ENGINEERING SERVICES, INC.

Plaintiff-Appellant

v.

UNITED STATES,

Defendant-Appellee

On Appeal from the United States Court of Federal Claims
Cause No.: 09-CV-0865, Judge Francis M. Allegra

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fed. R. App. P. 26.1 and Fed. Cir. R. 28 (a)(1) and 47.4, the undersigned counsel of record for Appellant certifies the following (*see also* Certificate of Interest filed May 28, 2013). These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

1.    The full name of every party represented by me is: Lakeshore Engineering Services, Inc. – Appellant. Lakeshore Engineering Services, Inc. is the real party in interest.

2.    Lakeshore Engineering Services, Inc. is wholly owned by Lakeshore Toltest Corporation, a privately held Delaware corporation.  There are no publicly held companies that own 10% or more of the stock of Lakeshore Engineering Services, Inc.

3.    Phil B. Abernethy, Butler, Snow, O'Mara, Stevens & Cannada, PLLC – counsel for Appellant;

4.    LeAnn W. Nealey, Butler, Snow, O'Mara, Stevens & Cannada, PLLC – counsel for Appellant;

5.    United States – Appellee;

6.    Jane Dempsey - Department of Justice – Civil Division, Commercial Litigation – Counsel for Appellee;

7.    Acting Assistant Attorney General Stuart F. Delery - Counsel for Appellee;

8.    Jeanne E. Davidson - Department of Justice - Director - Counsel for Appellee.

9.    Patricia M. McCarthy - Department of Justice – Assistant Director - Counsel for Appellee.

/s/ LeAnn W. Nealey
Counsel for Appellant

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................... i

CERTIFICATE OF INTERESTED PERSONS .................................... ii

TABLE OF CONTENTS ............................................................................. iv

TABLE OF AUTHORITIES ................................................................... vii

STATEMENT OF RELATED CASES ....................................................... x

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ......................................................................... 2

I.   STATEMENT OF THE CASE ........................................................ 3

    A.   Nature of the Case ................................................................. 3

    B.   Course of Proceedings. .......................................................... 4

STATEMENT OF FACTS ........................................................................ 5

    A.   The Solicitation and Contract Award. ................................. 5

    B.   Gordian Did Not Properly Update the 2006 UPB. ........... 11

    C.   Extraordinary Inflation Occurred With Respect to Certain Key Construction Items During the First and Second Years of the Contract. ......................................................................... 13

    D.   The Government did not Allow Lakeshore Relief on the Pricing Issues. ................................................................................. 14

III. SUMMARY OF ARGUMENT ...................................................... 14

IV. ARGUMENT ................................................................................... 16

    A.   Standard of Review. .............................................................. 16

    B.   The Court of Federal Claims Erred by Granting Summary Judgment on Lakeshore's Breach of Contract Claim Because the Contract Required that the Government Use Fair and Accurate

Local Pricing and that the Government Allow for Equitable Adjustments for Inflation. The Government Breached these Contractual Obligations.................................................................17

1.   The Government is Bound by its Contractual Representation that the UPB Reflected Local Prices for Labor, Materials and Equipment. ........................................................................18

   a.   The terms of the Contract show that the Government is bound by its representation that the UPB reflected local prices for labor, material and equipment...............................18

   b.   The circumstances surrounding the Solicitation show that the 2006 UPB was intended to reflect local, post-Hurricane Katrina pricing for labor, material and equipment. ............26

2.   The Contract Required the Government to Allow an Equitable Adjustment for Inflation. .................................................32

   a.   The Contract provisions and the FAR regulations show that Lakeshore is entitled to an equitable adjustment for inflation. ................................................................................33

   b.   The Government intended to allow for an equitable adjustment under the Contract beyond the 4% adjustment allowed under the economic adjustment clause....................35

3.   Lakeshore Relied on the Contract Terms. .....................................38

4.   The Government Breached the Contract. .......................................39

C.   The Court of Federal Claims Erred in Granting Summary Judgment on Lakeshore's Implied Warranty Claim...................40

D.   The Court of Federal Claims Erred in Granting Summary Judgment on Lakeshore's Claim Based on Mutual Mistake of Fact..................................................................................................45

1.   The parties to the Contract were Mistaken in their Belief regarding a Fact.................................................................................................46

     2.    **The Parties' Mistaken Belief Constituted a Basic Assumption Underlying the Contract and had a Material Effect on the Bargain.** ........................................................................................... 48

     3.    **The Contract did not put the Risk of the Mistake on Lakeshore.** 49

     E.    **The Government Breached its Obligations of Good Faith and Fair Dealing.** ........................................................................................... 55

**CONCLUSION** .................................................................................. 59

**CERTIFICATE OF COMPLIANCE** ................................................. 61

**ADDENDUM** .................................................................................... 62

# TABLE OF AUTHORITIES

**Cases**

*Aluminum Co. of America v. Essex Group, Inc.,* 499 F. Supp. 53
(D.C. Pa. 1980) ............................................................................ 47, 52

*Alvin Ltd. v. United States Postal Serv.,* 816 F.2d 1562 (Fed. Cir.1987) ... 18, 31, 46

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ........................... 16

*Atlas Corp. v. U.S.,* 895 F.2d 745 (Fed. Cir. 1990)................................. 45

*Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374 (Fed. Cir. 1999).......... 16

*Beta Sys. Inc. v. United States,* 838 F.2d 1179
(Fed. Cir. 1988).......................................................... 18, 46, 50, 52, 53

*Bob's Shell, Inc. v. O'Connell Oil Assocs.,* 2005 U.S. Dist. LEXIS 21318
(D. Mass. Aug. 31, 2005)........................................................... 57

*C&E Servs. v. Ashland, Inc.,* 498 F. Supp. 2d 242 (D. D.C. 2007) ......................... 56

*Centex Corp. v. United States,* 395 F.3d 1283 (Fed. Cir. 2005) ................. 55, 56, 58

*ConocoPhillips v. U.S.,* 501 F.3d 1374 (Fed. Cir. 2007) ................................... 37, 54

*Consolidated Edison Co. of N.Y., Inc. v. Richardson,* 232 F.3d 1380
(Fed. Cir. 2000)........................................................................ 16

*Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370 (Fed. Cir. 2002)...... 16

*D.F.K. Enterprises, Inc. v. U.S.,* 45 Fed. Cl. 280 (1999) ................................... 41, 44

*Daff v. U.S.,* 78 F.3d 1566 (Fed. Cir. 1996) ........................................... 25

*Die Casters Intern., Inc. v. U.S.,* 67 Fed. Cl. 362 (2005)................................. 32

*E.L. Hamm & Associates, Inc. v. England,* 379 F.3d 1334
(Fed. Cir. 2004)................................................................ 41, 42, 44

*Edward R. Marden Corp. v. U.S.,* 803 F.2d 701 (Fed. Cir. 1986).......................... 31

*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547 (Ct. Cl. 1971) ......... 46

*Hercules, Inc. v. United States*, 292 F.2d 1378 (Fed. Cir. 2002) ............................ 18

*Hol-Gar Mfg. Corp. v. United States,* 351 F.2d 972 (Ct. Cl. 1965) ....................... 17

*JOC, Inc. v. ExxonMobil Oil Corp.*, 2010 U.S. Dist. LEXIS 32305
    (D.N.J. Apr. 1, 2010) ................................................................. 57

*M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203 (Fed. Cir. 2004) ................. 18, 37

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,* 169 F.3d
    747 (Fed. Cir.1999) ............................................................. 17, 31

*Moden v. United States,* 404 F.3d 1335 (Fed. Cir. 2005) ...................................... 32

*National Presto Indus., Inc. v. United States,* 338 F.2d 99 (Ct. Cl. 1964) ............. 45

*Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339
    (Fed. Cir. 2008) ................................................................. 20

*Polarad Electronics, Inc.* ACAB No. 1116, 1971 WL 18012
    (A.C.A.B. April 27, 1971) ............................................... 51, 53

*Precision Pine & Timber, Inc. v. U.S.,* 596 F.3d 817 (Fed. Cir. 2010) ............. 56, 58

*Rumsfeld v. Freedom NY, Inc.*, 346 F.3d 1359 (Fed. Cir. 2003) ............................ 21

*Short Bros., PLC v. U.S.,* 65 Fed. Cl. 695 (2005) .................................... 53, 55

*Southwest Welding & Mfg. Co. v. United States*, 373 F.2d 982 (Ct. Cl.  1967) ..... 52

*Steinberg v. U.S.,* 90 Fed. Cl. 435 (2009) ........................................... 17

*Teg-Paradigm Environmental, Inc. v. U.S.*, 465 F.3d 1329
    (Fed. Cir. 2006) ........................................................ 17, 20, 32

*The Confederated Tribes of the Colville Reservation v. United States,*
    964 F.2d 1102 (Fed. Cir. 1992) ........................................ 16

*Young-Montenay, Inc. v. United States*, 15 F.3d 1040 (Fed. Cir. 1994) ................ 16

*United States v. Spearin*, 248 U.S. 132 (1918) ................................. 41, 45

*USA Petroleum Corp. v. United States*, 821 F.2d 622 (Fed. Cir. 1987) ................ 44

*Walsh v. United States*, 102 F. Supp. 589 (Ct. Cl. 1952)..........................................52

**Statutes, Rules and Regulations**

28 U.S.C. § 1295 ......................................................................................1

41 U.S.C. § 601 ........................................................................................4

Fed. R. App. P. 26.1 ...................................................................................i

Fed. R. App. P. 4 ......................................................................................1

Fed. R. App. P. 47.5 ...................................................................................i

Fed. Cir. R. 28 ...........................................................................................i

RCFC 56............................................................................................16, 32

DAR 3.404.3(c)(3) c.5...................................................................51, 52

FAR 252.243-7002 ...................................................................................33

FAR 16.203-4(d)(iii) .........................................................................33, 53

FAR 16.203.2 .....................................................................................34, 53

FAR 16.203.3 .....................................................................................34, 53

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the trial court was previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

On April 3, 2013, the United States Court of Federal Claims, Judge Francis M. Allegra, issued his Opinion, *Lakeshore Engineering Services, Inc. v. The United States* (hereafter, "Op." (ADD-1)[A8-22]) (*Lakeshore Eng'g Servs. v. United States,* 110 Fed. Cl. 230 (Fed. Cl. 2013)), granting summary judgment in the Government's favor and dismissing Lakeshore's complaint. A final judgment was entered on April 4, 2013 (ADD-2) [A23]. Lakeshore Engineering Services, Inc. ("Lakeshore") timely filed its notice of appeal on May 16, 2013 [A24-26], within the time required by Fed. R. App. P. 4(a)(1)(B). This is an appeal from a final decision of the United States Court of Federal Claims and therefore this Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF ISSUES

1.    Where the Contract between the Government and Lakeshore expressly obligated the Government to use fair and accurate local pricing and to allow for an equitable adjustment for inflation, and the parties' intent and contemporaneous circumstances surrounding the formation and implementation of the Contract also support this interpretation; and where the Government breached these obligations, did the Court of Federal Claims err in granting summary judgment in the Government's favor on Lakeshore's breach of contract claim?

2.    Where the Government represented in the Technical Specifications in the Contract that the UPB was "modified for Fort Rucker" and the UPB did not contain accurate local pricing, did the Court of Federal Claims err in granting summary judgment in the Government's favor on Lakeshore's breach of implied warranty claim that the contract documents and specifications were complete, accurate, and free from error?

3.    Where at least a question of material fact exists on the four elements necessary to show a claim for mutual mistake of fact, did the Court of Federal Claims err in determining that Lakeshore could not proceed on its mutual mistake of fact claim?

4.    Did the Court of Federal Claims err in granting summary judgment in the Government's favor on Lakeshore's breach of good faith and fair dealing claim?

# I.    STATEMENT OF THE CASE

## A.    Nature of the Case.

This case was before the Court of Federal Claims on the Government's motion for summary judgment.  Plaintiff Lakeshore was awarded an Indefinite-Delivery/Indefinite Quantity contract to provide, via job orders, construction services to the U.S. Army at Fort Rucker, Alabama. The Solicitation for this contract anticipated that the price of task orders would be set by multiplying the prices in a specified pricing book by a bidder's coefficient. The bidder was required to use the pricing book specified by the Government.

The basis for Lakeshore's lawsuit is that a material condition of the contract was both parties' belief, and the Government's express contractual promise, that the pricing book fairly and accurately reflected local prices in the Fort Rucker, Alabama area. The pricing book did not do so.  Instead, the prices in the required price book significantly understated the costs of certain materials and the various adjustment clauses in the contract failed to account for these differences.   An additional material condition of the Contract was the Government's obligation to allow for an equitable adjustment for the extraordinary inflationary circumstances not otherwise anticipated by the parties.  The Government likewise breached this obligation when it failed to allow an equitable adjustment under these circumstances.

3

Lakeshore seeks damages or an equitable adjustment for the difference between the prevailing local prices and the prices dictated by the Government's price book. Lakeshore's claims against the Government are based on breach of contract, breach of the covenant of good faith and fair dealing, breach of the implied warranty that the contract documents were free from error, and mutual mistake of fact.

## B. Course of Proceedings.

Believing it had been damaged as a direct and proximate result of the Government's actions, on March 10, 2009, Lakeshore filed its claim for equitable adjustment with the Contracting Officer pursuant to the Contract Disputes Act of 1978 (the CDA), 41 U.S.C. § 601, *et seq.*, seeking recovery of $1,996,152.40 for losses it incurred performing in the base year and first option year of the Contract.

On June 25, 2009, the Contracting Officer issued a Final Decision denying recovery. On December 15, 2009, Lakeshore filed its Complaint in the Court of Federal Claims [A27-103], which the Court allowed to be amended on April 19, 2011. A104-117. Defendant filed its motion for summary judgment on January 13, 2012 [A118-176]; Lakeshore responded on February 10, 2012 [A177-245]; and Defendant replied on March 23, 2012 [A440-462]. Oral argument was heard on September 19, 2012. Due to operational errors, the recording equipment did not record the argument ([A246]), and thus the trial court allowed the parties to file a

recitation of points that were raised in the oral argument. *Id*. Lakeshore submitted is recitation of points on October 15, 2012 [A247-258], as well as an amended response to the Government's proposed undisputed facts [A259-278].

The trial court issued its Opinion granting summary judgment in the Government's favor on April 3, 2013 [ADD-1] [A8-22], and judgment was entered on April 4, 2013 [ADD-2] [A23]. Lakeshore timely filed its appeal on May 16, 2013 [A24-26].

## II.    STATEMENT OF FACTS[1]

### A.    The Solicitation and Contract Award.

In December, 2006, the Southern Region Contracting Center East, the U.S. Army Contracting Agency, published Solicitation No. 911SE-07-R-007-0002 ("the Solicitation") for a negotiated IDIQ Job Order contract (the "Contract") for one base year and four subsequent option years. A279-339; A340 (¶3), A361 (¶3).

As part of the Contract terms, Divisions 1-16 of a December 2006 Universal Unit Price Book entitled "Fort Rucker Job Order Contract Construction Task Catalog," published by The Gordian Group ("Gordian Book" or "UPB"), were listed as attachments to the Solicitation: "7. Attachments: . . . **b. ATCH 2 – Progen Unit price Book (UPB), Divisions 1 through 16.**" A284 (emphasis

---

[1] To avoid repetition, additional facts relating to specific issues are detailed in the Law and Argument section below.

added).  Again at page 43 of the Solicitation, the Technical Specifications section provides that "[t]he []UPB, consists of Divisions 1 through 16 that are applicable to Divisions 1 through 16 of the Job Order Contract Technical Specifications." A320 (Section SC-3(b)(2)).  Divisions 1 through 16 of the UPB consist solely of the unit prices for construction/supply at Ft. Rucker.

The entire publication of the UPB contains not only Divisions 1 through 16, but also an introduction narrative which is Division 0.  *See* A354-360 (UPB Page 00-1 through 00-7).  Though the entire UPB was furnished to the bidding contractors, Division 0 was not listed as an attachment to the Solicitation.

The Contract required the contractor to purchase from the Gordian Group the UPB and accompanying operating software, and the Government designated the UPB pricing as binding on the contractors submitting price proposals.  Use of the Gordian Group UPB was non-negotiable.  A341 (¶4), A361-362 (¶4); *see* A292-293.

The Solicitation specified that the "UUPB [was] modified for Fort Rucker." A341 (¶5), A349, A362 (¶5), A368; A320-321.

The Solicitation required that the "offer shall be a coefficient" applied to the UPB prices.  A341 (¶6); A291-292.  In defining "coefficient," the Solicitation specified that the term "means a numerical factor that represents costs (generally **indirect** costs) not considered to be included in the Universal Unit Price Book

6

(UUPB) prices." *Id.* (emphasis added). The Solicitation also specified that "[t]he unit prices stated in the UPB includes labor, material, and equipment costs." A341 (¶6) A292.

The Solicitation provided that "the offeror's coefficient must include, but not be limited to" (A292) a number of adjustment factors, including, among others, an adjustment factor for "[o]ther risk of doing business" *(id.)* specifically defined as **"(i.e., risk of a lower than expected contract dollar value; risk of poor subcontractor performance and re-performance)."** *Id.* (emphasis added).

As noted above, Division 0 of the UPB was not an attachment to the Solicitation and Contract. Though some language from Division 0 of the UPB was repeated by the Government in the Solicitation and Contract, other language was not. Relevant here, Division 0 of the UPB also lists "adjustment factors" for the contractor's coefficient including "[b]usiness risks such as the risk of a lower than expected volume of work, smaller than anticipated Job Orders, poor Subcontractor performance, **and inflation or material cost fluctuations**." A355 (UPB Page 00-2) (emphasis added). In contrast, as quoted above, the business risk adjustment factor for the contractor's coefficient as set forth in the Solicitation and Contract did not include any reference to "inflation or material cost fluctuations".

Similarly, Page 3 of Division 0 of the UPB provides:

> While diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the

7

> Contractor to verify the unit prices and to modify their
> Adjustment Factors accordingly.

A356 (UPB Page 00-3).  This language as to the risk being on the contractor for

the accuracy of unit prices **was not** included by the Government in the Solicitation

and Contract.

> Likewise, Division 0 of the UPB contained the following language:

> Contractors may find differences in labor, equipment and
> material cost due to certain economic factors.

A356 (UPB Page 00-3).  This language was not included in the Solicitation and

Contract.

At the time of the Solicitation, no one knew what the future task orders

would be and, in any event, it would have been impossible to verify the unit prices.

The UPB had more than 70,000 unit prices.  Because there were tens of thousands

of line items of prices in the UPB, and because the bidding contractors had less

than thirty days to prepare their bids, there was not adequate time or resources for

Lakeshore, or any contractor, to independently determine the accuracy of the UPB

pricing as compared to actual local rates.  A343 (¶11).  Lakeshore could not, and

did not, do so.  *Id.*

Lakeshore used the Government's definition of business risks, as set out in

the Solicitation, in determining its bid coefficient.  A342 (¶9), A352-353.

The purpose under the Contract for incorporating the unit prices set forth in the **2006** UPB was that those unit prices would accurately reflect the prevailing local prices for labor, material and equipment which the bidding contractor would encounter in the Dothan, Alabama area.    The Government learned from its experience with the prior contractor at Fort Rucker that the earlier Gordian Book used at that time **did not** reflect local pricing, primarily due to Hurricane Katrina's effect on the availability of construction materials and labor.    A386-388; A389-390, A425.    For this reason, the Government representatives responsible for the Solicitation and administration of the Lakeshore Contract did not want to use the Gordian Book prices and have them fixed over a five-year period, with only an annual adjustment to the coefficient.    A399-401, A403.    When ultimately overruled on this issue by the Atlanta regional office, the Government instructed the Gordian Group to update the Gordian Book pricing to reflect **current** pricing.

The Government's representatives believed that the Gordian Group had made the proper adjustments at the time the Solicitation was issued for the Lakeshore Contract, and that the 2006 UPB accurately reflected local, post-Hurricane Katrina pricing, and they expected the bidding contractors to rely on that fact.    A391-393, A402, A423-424.

The Government also believed at the time the Solicitation was issued that the annual inflation/deflation adjustment based upon a construction cost index as

9

set forth in the Contract (A318) would accurately reflect the actual inflation/deflation which occurred at the site. A393-395. Moreover, the Contract incorporated by reference FAR 252.243-7002, which provides the mechanism for seeking equitable adjustment under the Contract. A306.

Lakeshore prepared its response to the Solicitation based upon the belief that the prices in the UPB were fair, accurate and reflective of local prices for labor, materials and equipment for the base year of the Contract, as well as for the option years subject to a price escalation factor. A342-343 (¶10). Lakeshore bid at a coefficient factor of 1.28 for the Base Year, which coefficient factor was intended to cover indirect costs associated with the UPB prices. A343 (¶12). In determining this coefficient, Lakeshore accepted the Gordian Book direct cost unit prices, which were represented to have been recently surveyed for the local market, as accurately reflecting the average local prices for materials, equipment and labor.

Lakeshore compared those prices to its own average cost experience in other areas of the country to determine whether the average local cost should be adjusted to conform to the contractor's own average costs. Lakeshore found that the UPB prices were low compared to Lakeshore's historical experience in other areas of the country and adjusted its bid coefficient 6% upward. In undertaking this task, Lakeshore did not perform an independent cost review at Fort Rucker or the Dothan, Alabama area. Lakeshore relied upon the Gordian Book prices as

10

accurately reflecting the average local prices in the Dothan, Alabama area. This 6% upward adjustment had nothing to do with believing that the actual local prices were different than the UPB, because Lakeshore would not have known that, one way or the other. *Id.*

Lakeshore was the lowest responsive bidder to the Solicitation and on April 26, 2007, Lakeshore was awarded JOC Contract No. W911SE-07-D-0040, with a bid coefficient factor of 1.28 for the Base Year. A344; A362. The Government's first task order under the Contract was not issued until eight months later, on July 25, 2007. A107 (Am. Compl. at ¶12). The First Option Year was awarded on April 27, 2008. The coefficient for subsequent Option Years was to be adjusted on a yearly basis utilizing an "Economic Price Adjustment" protocol established in the Contract. The "Economic Price Adjustment" for the First Option Year resulted in a gross 4% increase for each line item in the UPB. Under this formula, the coefficient factor for the First Option Year beginning April 27, 2008 was adjusted to 1.32. A362.

## B.    Gordian Did Not Properly Update the 2006 UPB.

What neither the Government representatives nor the bidding contractors such as Lakeshore knew at the time bids were prepared and received under this Solicitation was the totally ineffective manner in which the Gordian Group attempted to update the pricing in the Gordian Book to reflect post-Katrina prices.

The "update" to local prices attempted by the Gordian Group was limited to "spot checking" about four pages of construction items in the local market, without reference to whether those items were the critical ones affected by Hurricane Katrina, and without reference to whether those items were the ones which most adversely affected the prior contractor. A429-434, A435-439. In fact, they were not. The items "spot-checked" for the Gordian Book "update" did not include any prices for steel buildings, for petroleum-based products, or for labor or supervision. This "spot-check" by the Gordian Group covered approximately 200 items, compared to the Gordian Book, which included 2,547 pages of pricing for more than 70,000 items. *See* A429-434 (showing the items "spot checked" by the Gordian Group to "update" the Ft. Rucker prices).

Given the superficial "update" of local prices conducted by the Gordian Group, when Lakeshore began performance under its Contract it encountered the very problems which had been encountered by the prior contractor; namely, that the Gordian Book prices did not accurately reflect current local pricing. A363-364 (¶¶7-11).[2] The items on which the greatest disparity existed were items related to

---

[2] Colt Odeh is currently a Vice President of Lakeshore and was a Vice President with Lakeshore beginning January, 2008. His Affidavit is based upon his personal knowledge, as well as his experience, education, training, and his review of the Lakeshore's business records relating to the Contract. Because Mr. Odeh was a Vice President with Lakeshore at relevant times, Lakeshore believes that Mr. Odeh's testimony is fact witness testimony and has identified him as such. In an

steel building construction, petroleum-based products, labor and supervision. A363 (¶7). These were the very items which were most prevalent in the work orders actually assigned to Lakeshore in the first two years of the Contract.

## C.    Extraordinary Inflation Occurred With Respect to Certain Key Construction Items During the First and Second Years of the Contract.

In addition to the inaccurate initial prices contained in the Gordian Book, there also was a major spike in the price of steel, oil, and certain other construction items during the first and second year of Lakeshore's contract. A363-364 (¶8), A370-377. The task orders issued by the Government during the first and second years of Lakeshore's contract were heavily weighted with the requirement to construct steel buildings. A364 (¶10).

During the course of the first two years of the Contract, Lakeshore told the Government that it would need price adjustments due to escalating costs and the Gordian Book's failure to accurately reflect local prices for labor, material and equipment. A364 (¶11). The Government also independently learned of the price spikes in certain construction materials and acknowledged the significant price increases beyond those contained in the UPB, or covered by the economic adjustment clause in the Contract. A396-397, A404-421.

---

abundance of caution, however, Lakeshore also designated him as an expert in this case. A380-384.

**D.    The Government did not Allow Lakeshore Relief on the Pricing Issues.**

Despite casting about for a way to equitably adjust the Lakeshore Contract to account for these unforeseen conditions, the Government's site representatives ultimately concluded that they did not have the authority to equitably adjust the contract prices. A426-427. The Government did not allow Lakeshore any relief on the pricing issues. A364 (¶11), A379.

## III.    SUMMARY OF ARGUMENT

The plain meaning of the Contract, the parties' intent, and the contemporaneous circumstances surrounding its formation and administration, all show that under the Contract, the Government was contractually obligated: (i) to use a pricing index that fairly and accurately reflected local prices for labor, materials and equipment; and (ii) to allow for an equitable adjustment due to extraordinary inflationary circumstances not otherwise anticipated by the contracting parties nor provided for by the UPB pricing published by The Gordian Group. These were material conditions of the Contract, relied upon by Lakeshore in entering the Contract. The Government did not comply with these obligations, in breach of the Contract and the Government's duties of good faith and fair dealing under the Contract. Likewise, because the UPB pricing failed to accurately reflect prevailing local rates, the Government also breached its implied warranty that the Contract documents and specifications would be complete, accurate, and

14

free from error. The trial court erred in granting summary judgment in the Government's favor on Lakeshore's claims based on breach of contract, breach of the covenant of good faith and fair dealing, and breach of the implied warranty that the contract documents were free from error.

The trial court also erred in granting summary judgment in the Government's favor on Lakeshore's claim based on the parties' mutual mistake of fact. Lakeshore should be allowed to proceed on this claim because there exists a question of material fact as to the four elements necessary to establish a mutual mistake of fact claim: Both Lakeshore and the Government mistakenly believed that the UPB fairly and accurately reflected local rates for labor, materials and equipment; the accuracy of the UPB was a basic assumption underlying the Contract; the Solicitation required that the bidder's offer "shall be a coefficient" applied to the UPB prices, thus the accuracy of the UPB pricing was essential to the Contract; and, finally, the Contract did not place the risk of mistake on Lakeshore.

For these reasons and as detailed below, summary judgment in the Government's favor should be reversed and this case remanded for a trial on the merits.

15

# IV.    ARGUMENT

## A.    Standard of Review.

In ruling on a motion for summary judgment, a court does not weigh the evidence to determine the truth of the matter, but rather assesses whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002); RCFC 56.   "[This] court evaluates the conflicting evidence proffered by the parties de novo, in the light most favorable to the non-moving party." *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1041-42 (Fed. Cir. 1994), citing *The Confederated Tribes of the Colville Reservation v. United States*, 964 F.2d 1102, 1107 (Fed. Cir. 1992).   In particular, this court "review[s] a district court's grant of a motion for summary judgment without deference, applying the summary judgment standard anew."    *Consolidated Edison Co. of N.Y., Inc. v. Richardson*, 232 F.3d 1380, 1383 (Fed. Cir. 2000), citing *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).    Under these standards, the trial court's summary judgment in the Government's favor should be reversed and the case remanded for trial.

**B.**    **The Court of Federal Claims Erred by Granting Summary Judgment on Lakeshore's Breach of Contract Claim Because the Contract Required that the Government Use Fair and Accurate Local Pricing and that the Government Allow for Equitable Adjustments for Inflation. The Government Breached these Contractual Obligations.**

To recover for a breach of contract, a party must allege and establish: "(1) a valid contract between the parties, (2) an obligation or duty arising under the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Steinberg v. U.S.,* 90 Fed. Cl. 435, 444 (2009) (other citation omitted). Lakeshore alleged, and can prove, these elements here.

The Court, in interpreting a contract, is to give the language of the contract "'that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,* 169 F.3d 747, 752 (Fed. Cir.1999), quoting *Hol-Gar Mfg. Corp. v. United States,* 351 F.2d 972, 975 (Ct. Cl. 1965). In analyzing an unambiguous contract provision, the Court is to consider the "plain meaning" of the contractual language. *Teg-Paradigm Environmental, Inc. v. U.S.,* 465 F.3d 1329, 1338 (Fed. Cir. 2006). Even in the absence of ambiguity, however, extrinsic evidence of the circumstances surrounding the contract provision[s] at issue may be considered: The Federal Circuit will look to extrinsic evidence to "confirm that the parties intended for the term to have its plain and ordinary meaning." *Id.* (other citation omitted). It is "a fundamental

17

precept of common law that the intention of the parties to a contract controls its

interpretation." *Beta Sys. Inc. v. United States,* 838 F.2d 1179, 1185 (Fed. Cir.

1988); *Alvin Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1565 (Fed.

Cir.1987); *M.A. Mortenson Co. v. Brownlee,* 363 F.3d 1203, 1206 (Fed. Cir. 2004).

("The Court must construe a 'contract to effectuate its spirit and purpose'"),

quoting *Hercules, Inc. v. United States,* 292 F.2d 1378, 1381 (Fed. Cir. 2002).

> **1.    The Government is Bound by its Contractual Representation that the UPB Reflected Local Prices for Labor, Materials and Equipment.**
>
> > **a.    The terms of the Contract show that the Government is bound by its representation that the UPB reflected local prices for labor, material and equipment.**

It is undisputed that the Government issued its Solicitation for the Contract

in December 2006 (A340 (¶3), A361 (¶3)), Lakeshore was the lowest responsive

bidder to the Solicitation (A344), and the Government awarded the Contract to

Lakeshore on April 26, 2007. *Id.* The Contract included all terms and conditions

of the Solicitation. *See* A279-339. Also undisputed is that the Contract required

the contractor to purchase from the Gordian Group the UPB and accompanying

operating software, and the Government designated the UPB pricing as binding on

the contractors submitting price proposals. Use of the Gordian Group UPB was

non-negotiable. A341 (¶4), A361-362 (¶4); *see* A292-293.

As part of the Contract terms, Divisions 1-16 of the UPB, which consist solely of the unit prices for construction/supply at Ft. Rucker, were listed as attachments to the Solicitation. A284; A320 (Section SC-3(b)(2)).

The entire publication of the UPB contains not only Divisions 1 through 16, but also an introduction narrative which is Division 0. *See* A354-360 (UPB Page 00-1 through 00-7). Division 0 contains introductory language about using the UPB and also contains the Gordian Group's caveats regarding the accuracy of the prices listed in the UPB (A354-360), but Division 0 was intentionally eliminated from the Contract by the Government.

Though the entire UPB was furnished to the bidding contractors, Division 0 – in contrast to Divisions 1-16 – was not listed as an attachment to the Solicitation and was not incorporated by reference into the Solicitation. Under the law of this Circuit, this Court's sister circuits, and a majority of state courts, Division 0 of the UPB, therefore, was not a part of the Contract and Solicitation: "[T]he language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history)." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339,

19

1343-46 (Fed. Cir. 2008);[3] *see Teg-Paradigm Envtl., Inc.,* 465 F.3d at 1341 (holding that work plan was not part of contract because "[n]owhere does the contract state that the work plan is to be integrated into the contract and supersede the contract specifications").

This is particularly true here, where, in contrast to its decision not to reference Division 0 of the UPB, the Government **did** expressly reference Divisions 1-16 of the UPB as attachments, as well as other documents (*see* A284), and specifically incorporated by reference numerous FAR provisions in the Contract and Solicitation. *See* A304-306. The court found this relevant in the *Teg-Paradigm Envtl.* case, holding that the subject work plans were not incorporated by reference, "**in contrast [to]**, . . . several sections of the FAR [that were] incorporated [and] several other documents relating to payment bonds, performance bonds, and wage rates." 465 F.3d at 1341 (emphasis added) (other citation omitted).

Additionally, furnishing the entire UPB, without more, is not enough. Again in *Teg-Paradigm Envtl,* even where the work plans at issue were attached to the contract (but not incorporated by reference), that court found this fact

---

[3]  The Court also recognized that "[o]ur insistence on explicit references and clear language of incorporation accords with our sister circuits' understanding of the common law of contracts" (citing cases) as well as "'a majority of states [which] have concluded that the contract must clearly and specifically reference the document to be incorporated.'"(citing cases). *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343-46 (Fed. Cir. 2008).

"unpersuasive", citing *Rumsfeld v. Freedom NY, Inc.*, 346 F.3d 1359, 1361 (Fed. Cir. 2003)(per curiam): "One party to a contract cannot bind the other simply by attaching a document to a copy of the contract, even if that particular copy is signed. . . . Rather, the documents must clearly indicate that the parties intended that they be considered together as a single contract."

Thus, by specifically limiting Contract to Divisions 1 through 16 of the UPB, the Government specifically and intentionally eliminated the narrative contained in Division 0 from the Solicitation and Contract, demonstrating that it intended that the bidding contractors focus solely on the prices contained in the UPB.

In short, the express wording of the Contract and Solicitation show that the Government represented that the UPB reflected local prices for labor, material and equipment, and is bound by that representation. The "Technical Specifications" section of the Contract repeatedly specified that the "[UPB was] modified for Fort Rucker" -- without qualification. A320-321. In contrast, Division 0 of the UPB contained the Gordian Group's explicit disclaimer that "[w]hile diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." A356 (UPB Page 00-3). Similarly, Division 0 of the UPB contained

the following language: "Contractors may find differences in labor, equipment and material cost due to certain economic factors." A356 (UPB Page 00-3).

Nowhere in the Contract and Solicitation did the **Government** set forth any such caveats as to the risk being on the contractor for the accuracy of unit prices with respect to **its** express promise to Lakeshore that the UPB "was modified for Fort Rucker" – without qualification. Indeed, the Government, as drafter of the Contract and Solicitation, made the conscious and intentional decision **not** to incorporate Division 0 of the UPB into the Contract, or to include any such language in the Contract itself.

This makes sense, because it would have been a physical impossibility for a bidding contractor, during the two to three week period of preparing its bid, to check the more than 70,000 unit prices set forth in the Gordian Book with current local pricing. Because there were tens of thousands of line item prices in the UPB, and because it had less than thirty days to prepare its bid, there was not adequate time or resources for Lakeshore to independently determine the accuracy of the UPB pricing as compared to actual local rates. A343 (¶11). Lakeshore could not, and did not, do so. *Id.*

Moreover, at the time of bidding, no one knew whether the task orders to be issued by the Government over the next five years would include steel buildings, site work, heavy civil and concrete work, or the percentage mix of any of them.

22

Thus, both parties were left to rely upon the accuracy of the UPB prices and neither party attempted to determine, nor could they have determined, an accurate number to include in the coefficient to account for any discrepancy between the UPB and the current local prices for construction items to be included in future task orders issued by the Government. *See* A342-343 (¶¶10-12).

The same analysis applies with respect to the adjustment factors that the contractors were to take into consideration in setting the coefficient to be applied to the UPB prices. A reasonable interpretation of the Solicitation is not only that the Government did not require the bidder to verify UPB prices, but also that the Government did not intend that the bidder's coefficient should include an adjustment for cost fluctuations or inflation.

In this regard, the Solicitation required that the "offer shall be a coefficient" applied to the UPB prices. A341 (¶6) A291-292. In defining "coefficient," the Solicitation specified that the term "means a numerical factor that represents costs (generally **indirect** costs) not considered to be included in the Universal Unit Price Book (UUPB) prices." *Id.* (emphasis added). The Solicitation also specified that "[t]he unit prices stated in the UPB includes [sic] labor, material, and equipment costs." A341 (¶6) A292.

The Solicitation itemized in detail the factors to be included in the bidder's coefficient – and none of these factors included an adjustment for cost variations or fluctuations or for inflation. *See* A292.

As noted above, Division 0 of the UPB was not listed as an attachment to the Solicitation and Contract. Though some language from Division 0 of the UPB was repeated by the Government in the Solicitation and Contract, other language intentionally omitted. Relevant here, the omitted Division 0 of the UPB lists "adjustment factors" for the contractor's coefficient to include:

> Business risks such as the risk of a lower than expected volume of work, smaller than anticipated Job Orders, poor Subcontractor performance, **and inflation or material cost fluctuations**.

A355 (UPB Page 00-2) (emphasis added). This "business risk" definition was **not** used in the Solicitation. Instead, the "other risk of doing business" adjustment factor in the Solicitation made no reference to cost fluctuations or inflation, but instead was defined as: "Other risk of doing business (*i.e.*, risk of lower than expected contract dollar value; risk of poor subcontractor performance and re-performance)." A292.

The Government's express use of the term "i.e.", rather than "e.g." shows that the parenthetical explanation is not a list of non-exclusive examples, but rather is another way of defining "other risks of doing business". Moreover, though the Solicitation provides that the list of adjustment factors "is not limited to" these

24

factors (A292), the Government, did, in fact, define a particular business risk adjustment factor – and its specific definition of "other risk of doing business" prevails over any argument that other unspecified and undefined business risks should be included as part of this already-defined adjustment factor. *See, e.g., Daff v. U.S.*, 78 F.3d 1566, 1574 (Fed. Cir. 1996) (recognizing long-standing rule of contract construction "that specific contract provisions prevail over general provisions.") (other citation omitted).

Additionally, even if Division 0 could arguably be "incorporated by implication" (as the trial court suggests (*see* Op. at 9) [ADD-1] [A16]), the Government, as the drafter of the Solicitation and Contract, made a conscious and intentional decision to change the wording contained in Division 0 of the UPB and to eliminate the terms "inflation or material cost fluctuations" as being part of the business risk factor to be included in the coefficient. This shows the Government's intent that the bidder's coefficient is **not** to include an adjustment for price fluctuations or inflation.

Indeed, when a reasonable bidding contractor reads Division 0 of the UPB, and then sees that the Government repeated certain language from Division 0 in the Solicitation, but deleted other language, no reasonable bidder would have adjusted its bid price based upon the **deleted language**. Lakeshore reasonably relied on the

adjustment factors specified in the Contract, and used these same factors in determining its bid coefficient. 341-342 (¶¶ 7-9).

The changes and deletions from Division 0 of the UPB to the Solicitation, coupled with the fact that the Government in two separate locations in the Solicitation stated that the UPB attachment included only Divisions 1 through 16, evidence that the Government (i) was not placing the risk on the contractor if the UPB "modified for Fort Rucker" in 2006 did not accurately reflect local prices in the Ft. Rucker area in 2007; and (ii) intended that "inflation or material cost fluctuations" were to be included as part of the business risk adjustment factor for contractors to consider in setting their coefficient.

> **b.    The circumstances surrounding the Solicitation show that the 2006 UPB was intended to reflect local, post-Hurricane Katrina pricing for labor, material and equipment.**

The very purpose under the Contract for incorporating the unit prices set forth in the **2006** UPB was that those unit prices would accurately reflect the prevailing local prices for labor, material and equipment which the bidding contractor would encounter in the Dothan, Alabama area, as evidenced in the way in which this Contract – and use of the **2006** Gordian Book -- came into existence. The prior contractor performed its contract at Fort Rucker for one year of its five-year contract. When the Government failed to exercise its option within the time period specified in the contract to continue performance for the second year,

the prior contractor seized upon this technicality to refuse the second-year option. A386-388.

The Government's representatives who were administering that contract, who were the same Government representatives who prepared the Solicitation to bidders for the subject Contract, testified that the primary reason the prior contractor "walked away" from the contract was that the Gordian Book prices used at that time did not accurately reflect prevailing local prices post-Hurricane Katrina, and, in fact, were substantially less than the prevailing local prices in many instances. A388 (Dep. of Tommy Baldwin at p. 24:8-21).

The effect of Hurricane Katrina on local pricing is key. Hurricane Katrina was the worst natural disaster in the history of the Gulf Coast region, and had occurred only a few months earlier. As a result of the hurricane, there was a shortage of certain construction materials, skilled labor, and supervision. All available construction resources were being consumed by the rebuilding effort along the Gulf Coast, significantly impacting construction costs and labor availability in the Dothan, Alabama area, located only 30 miles from the Gulf Coast, as the Contracting Officer, Charles Baldwin, and Tommy Baldwin, the government representative responsible for preparing the Solicitation for the Lakeshore Contract, acknowledged. *See* A389-390 (acknowledging that a lot of "subs and skilled contractors got sucked up on the coast because of Katrina. . . [i]n

27

a rebuilding effort that went on for months and years."); A425 (acknowledging that the local workforce "went south" after Katrina and there "[w]asn't much left.").

Thus, the Government's representatives responsible for the Solicitation and administration of the Lakeshore Contract knew of the critical impact to local pricing caused by Hurricane Katrina, and they knew from the prior contract that the present Gordian Book pricing did not accurately reflect current, post-Katrina prices. Because of this background, the Government's representatives did not want to use the Gordian Book prices and have them fixed over a five-year period, with only an annual adjustment to the coefficient. In October, 2006, Tommy Baldwin was looking at the possibility of substituting the R.S. Means price book for the Gordian Group UPB, and he wrote to his staff:

> We need a UPB that is updated regularly by a company large enough to perform the market surveys and get the data. Do not plan on putting out a package with a single book to be used for five years with the coefficient changing yearly. This has proven NOT to work and cost us the last contract.

A399-400. Two months later, a member of Tommy Baldwin's staff stated a similar intention: "We do want an updated price book for each year of the contract with no change to the coefficient." A403. Even after Tommy Baldwin's staff determined that it would use the Gordian Group UPB, the staff expressly wanted the book to be updated annually. A401 (As stated by a member of the staff:

"Also, we will be using Gordian again and will have them provide us an updated price book for each year of the contract.").

Ultimately, the Government's local representatives were overruled by the Atlanta Regional Office, and they were instructed to use the Gordian Book prices without any annual update other than an inflation adjustment to the coefficient based upon a construction cost index formula.

When that decision was forced upon the Government's local representatives, those representatives did what they thought was necessary to ensure that the inequities in the Gordian Book pricing faced by the prior contractor were rectified for the Lakeshore Contract: They instructed the Gordian Group to update the Gordian Book pricing to reflect **current** pricing, and the Government's representatives believed the Gordian Group had made the proper adjustments at the time the Solicitation was issued for the Lakeshore Contract. A391-393, A402, A423-424.

Tommy Baldwin believed that the 2006 Gordian Book update for Ft. Rucker would account for the effects of Hurricane Katrina (*see* A391-392 ("The prices were updated [for post-Katrina]. It was to be the updated prices that the Gordian advertised for the solicitation.")), although he conceded that he did not know how the Gordian Group prepared this update:

> Q.    And what did [the Gordian Group] do to update them?
> A.    I don't know what they do . . . to keep their prices updated.

29

\* \* \* \*

A.    I know that a current price book was advertised for the solicitation.

Q.    What do you mean by current?

A.    An updated price book.

A391-392.

The Government's principal site representatives testified that they believed

that the Gordian Book, as updated for this Contract, accurately reflected local

prices, and that they expected the bidding contractors to rely upon that fact.  As

stated by the Contracting Officer, Charles Baldwin:

Q.    When you took over as contracting officer, didn't you assume that
the bidding contractors had accepted the Gordian prices as
accurately reflecting local prices?

A.    I never had seen the Gordian book.  I have only seen it a couple of
times since then.  I did not have a copy.  **I assumed that it was a
reflection of local [prices]**.

A423-424 (emphasis added).

Tommy Baldwin testified:

Q.    So at the time that this solicitation went out . . . , it was your belief
that the Gordian book line items reasonably and accurately
reflected local prices?

A.    Yes, sir.

Q.    And you put out this solicitation based on that assumption?

A.    Yes, sir.

A393.

Nancy Bledsoe, another Contracting Officer at Fort Rucker, also believed

that the UPB for the Lakeshore Solicitation would accurately reflect local pricing.

As she stated:  "The price book contains the cost for the going rates of labor and

materials correct? I would think the price book should be updated with current pricing and the co-efficient is applied for all costs other than the pre-priced unit prices." A402.

In sum, the express terminology used in the Contract, together with the parties' intent and the contemporaneous circumstances surrounding its formation and administration as described above, show that the Government represented, and intended to represent, that the UPB was a fair and accurate reflection of current local prices for labor, materials and equipment, and that bidders, like Lakeshore, were entitled to rely on that representation.[4]

Before the Court of Federal Claims, the Government contended that the Contract did not require the use of local prices. This interpretation is unreasonable in the face of the evidence outlined above. But even if the Court finds that both the Government's interpretation and Lakeshore's interpretation of the Contract are reasonable, the Court may then resort to the extrinsic evidence detailed above to resolve the ambiguity,[5] and derive a construction which "effectuates the parties' intent at the time they executed the contract." *Teg-Paradigm Environmental, Inc.,*

---

[4] The courts are to give meaning to the language of the contract derived from "the contemporaneous circumstances" (*Metric Constructors, Inc.,* 169 F.3d at 751) and "intention of the parties." *Alvin Ltd.,* 816 F.2d at 1565.

[5] *Edward R. Marden Corp. v. U.S.,* 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is a generally accepted rule, which requires no citation of authority, that if a contract is reasonably susceptible of more than one interpretation, it is ambiguous.")

465 F.3d at 1338. This standard shows that there is at least a genuine issue of material fact as to whether the Government represented, and intended to represent, that the UPB was a fair and accurate reflection of local prices for labor, materials and equipment, and that bidders, like Lakeshore, were entitled to rely on that representation. Thus summary judgment in the Government's favor on this issue is not appropriate. *See Die Casters Intern., Inc. v. U.S.*, 67 Fed. Cl. 362, 379 (2005) (recognizing that "[s]ummary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law", quoting *Moden v. United States,* 404 F.3d 1335, 1342 (Fed. Cir. 2005); *see also* RCFC 56(c).

Moreover, if the UPB had not been intended to reflect current local pricing that would have been a latent defect unknown to Lakeshore when it entered into the Contract, in the light of the facts set forth above. The Government should be bound by its current local pricing representation and Lakeshore is entitled to pursue the relief it seeks based on the Government's breach of this representation.

### 2.    The Contract Required the Government to Allow an Equitable Adjustment for Inflation.

Just as the Contract required the Government to utilize fair and accurate local pricing, the Contract also required that the Government allow for equitable adjustments for inflation, as again shown by its express terms and the intent of the parties.

a.    **The Contract provisions and the FAR regulations show that Lakeshore is entitled to an equitable adjustment for inflation.**

By incorporating by reference FAR 252.243-7002, which provides the mechanism for seeking an equitable adjustment (A306), the Government, as the drafter of the Contract, acknowledged that relief for the extraordinary inflation that occurred here may be obtained.    The Contract also contains an economic adjustment provision.    A318 (§5152.237.9000).    Though the formula under this provision did not adequately compensate Lakeshore for the extraordinary inflation that occurred during the first two years of the Contract in this case, the inclusion of this provision is relevant for another reason.    Namely, the fact that the parties agreed that either party should be compensated "for economic increase or decrease of the prices in the UPB" (*see* A318 (§5152.237.9000))  – whether anticipated or not – reflects the overall intent under FAR that (i) the Contract "permit a reasonable division of risk between the Government and the contractor" (FAR § 16.203-4(d)(iii)); (ii) such a remedy be available "when . . . there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance" (as here) (FAR § 16.203-2); and (iii) by including this provision the contracting officer was required to make the determination that equitable adjustment "was necessary either to protect the contractor and the Government against significant fluctuations in labor or material

costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." FAR § 16.203-3.

Also, as shown above, although Division 0 of the Gordian Book provides that the bid coefficient should include "business risks" such as "inflation or material cost fluctuations"(A342 (¶8), A355), Division 0 is not part of the Contract and Solicitation.    This "business risk" definition contained in the UPB was intentionally deleted from the language used in the Solicitation.  The Solicitation contained **no** reference to inflation, defining business risks as "other risk of doing business (*i.e.*, risk of lower than expected contract dollar value; risk of poor subcontractor performance and re-performance)."    A292.    This reflects the Government's plain intent that Lakeshore was not required to account for the business risk of unanticipated inflation as part of its bid coefficient.

In the light of these facts, under no interpretation can the term "business risk" be stretched so broadly so as to cover the risk that the unit price book selected by the Government as the accurate measure of current local prices would be inaccurate, or that the construction materials most heavily required during the first year of the contract would be the same construction materials whose prices would spike up to 100% during that same year.  The Government did not define the term in the Solicitation to include those risks, nor was it the Government's intent to

require Lakeshore to predict what inflationary events could occur during the five-year course of the Contract.

> **b.      The Government intended to allow for an equitable adjustment under the Contract beyond the 4% adjustment allowed under the economic adjustment clause.**

There was a major spike in the price of steel, oil, and certain other construction items during the first and second year of Lakeshore's contract. A362-363 (¶8), A370-378.  The Government's site representatives circulated among themselves a PowerPoint presentation showing that steel prices had spiked over 100% during the second year of Lakeshore's Contract, a spike which clearly could not have been anticipated by either the Government or Lakeshore at the time of bidding. *See* A404-418.  The task orders issued by the Government during the first and second years of Lakeshore's contract were heavily weighted with the requirement to construct steel buildings. A363 (¶10).

The Government's site representatives conceded that this unforeseen spike was not covered by the four percent (4%) increase in Lakeshore's coefficient allowed by the cost index formula in the Contract during the second year of the Contract. A416-418, A396-397.  When the PowerPoint presentation referenced above was circulated among the Government's site representatives in 2008, the following comments were made in the e-mail chain:

> This is a heads-up.  Steel prices on the rise again.  See attached letter from supplier. . . .  The real story is that nearly all commodities have

skyrocketed due to increases in oil and demand from the BRIC (Brazil, Russia, India and China) countries.

A417; *see* A416-418.

Tommy Baldwin recognized the significant spike in prices, and directed that

the Gordian Group be asked for a solution:

> Please forward this information to the Gordian Group and start a dialogue with them and (the Contracting Officer) regarding impact to the (Lakeshore) contract. Yesterday Mr. German with Lakeshore told me that steel price increases were adversely affecting their ability to perform and make a reasonable margin of profit . . . . You also need to speak with the same folks about the impact of constantly rising gas prices. A different estimating program could be making quarterly adjustments and we might not have this discussion.

A416. In his instructions to his staff, Tommy Baldwin admonished: "No need to

waste time explaining how the yearly coefficient adjustment is supposed to take

care of this" (*id.*) because, as he acknowledged in his deposition, the rise in steel

and gas prices was an event unforeseen by anyone. *See* A396-397.

Thus, under the express terms of the Contract, the applicable FAR

provisions, and the parties' intent as outlined above, the only reasonable

interpretation of the Contract is that the Government was contractually required to

allow for an equitable adjustment to address the inflationary events that occurred in

the first two years of the Contract. This construction is the only interpretation that

gives effect to the applicable law and the Contract provisions, in accordance with

the Contract's overall "spirit and purpose" (*M.A. Mortenson Co.,* 363 F.3d at 1206) and the intent of the parties. *Beta Sys. Inc.,* 838 F.2d at 1185.

In the trial court, the Government, relying on *ConocoPhillips v. U.S.,* 501 F.3d 1374 (Fed. Cir. 2007), argued that Lakeshore is limited to the economic adjustment provision in the Contract (FAR 5152.237-9000) to account for inflation. At issue in *ConocoPhillips* was the accuracy of the Petroleum Marketing Monthly ("PMM") the publication upon which an adjustment for the price of fuel would be based. The court in *ConocoPhillips* held that the PMM "constitutes a sufficiently accurate measure of 'established prices' to qualify as a permissible mechanism for price adjustment. . . ." *Id.* at 1378.

In contrast, the evidence set forth above shows that the Government's site representatives acknowledged that the economic adjustment provision in the Contract did not adequately address the extraordinary inflation that occurred here.[6] Unlike the Government in the *ConocoPhillips* case, the Government's representatives here agree with this assessment and conceded that the 4% coefficient calculated under FAR 5152.237-9000 would not fairly compensate Lakeshore. A416-418, A396-397. At the very least, there exists a question of fact on this issue and summary judgment in the Government's favor is not appropriate.

---

[6] The adjustment to UPB prices here was based upon an Engineering News Record survey of national inflation in construction materials.

### 3.    Lakeshore Relied on the Contract Terms.

The material conditions of this Contract were that the Government would use a pricing index that fairly and accurately reflected local prices for labor, materials and equipment; and that it would allow for equitable adjustment due to extraordinary inflationary circumstances not otherwise anticipated by the contracting parties. Lakeshore relied upon these terms in preparing its bid and entering into the Contract. A342-343 (¶¶9-10). It was reasonable for any bidder to assume that the Government's decision (i) not to include Division 0 of the UPB as part of the Contract; (ii) to expressly define "other risk of doing business" to **eliminate** "inflation or material cost fluctuations" as found in the UPB (A342 (¶8), A351); and (iii) not to include the language found in the Gordian Book that Lakeshore "verify the unit prices" (A356), meant that the Government did not intend for a bidder to account in its bid coefficient for price fluctuations or inflation for materials, equipment or labor. A342 (¶9). Lakeshore reasonably relied on the Government's Solicitation, and used the Government's definition of business risks in determining its bid coefficient. A342-343 (¶¶9-12). These specific factors were set forth in Lakeshore's bid proposal submitted to the Government. A341-342 (¶7), A352-353.

### 4.    The Government Breached the Contract.

During the course of the first two years of the Contract' Lakeshore told the Government that it would need price adjustments due to escalating costs (*see, supra* (§ II(C))) and the Gordian Book's failure to accurately reflect local prices for labor, material and equipment (*see, supra* (§ II(B))). A363 (¶11). The Government also independently learned of the price spikes in certain construction materials and acknowledged the significant price increases beyond those contained in the UPB, or covered by the economic adjustment clause in the Contract. *See, supra* at 35-36.

When the Government requested the Gordian Group to review the issue and determine whether the Gordian Book could be updated to accurately reflect the local prices currently being encountered by Lakeshore, the Gordian Group wrote a letter to the Contracting Officer advising that the prices should not be adjusted and that the contractor should, in so many words, be left to suffer the consequences of the unforeseen spike in prices. A419-420.

In response, the Contracting Officer made the following comments to his staff regarding this position by the Gordian Group representative:

> Kristina [the Gordian Group representative] has an attitude. She obviously looks down on contractors as a lower class beings (sic) than herself. This issue will remain open until I can find the time to do some research and do a realistic evaluation of the situation. When I get this done I will issue a Contracting Officer's decision on the matter. If I find merit in Kristina's narrow versioned opinion I will admit it, if not I will offer a rebuttal and we will figure out where to go from there.

A421.

The Government's site representatives knew that Lakeshore had been the victim of a UPB that did not accurately reflect prevailing local prices and that could not account for the acknowledged spike in critical building materials during the first and second year of the Contract. Though they attempted to find a way to equitably adjust the Lakeshore Contract to account for these unforeseen conditions, the Government's site representatives ultimately concluded that they did not have the authority to equitably adjust the contract prices. A426-427. Nor did the Government do anything to cure the inaccuracies in the UPB that were present from the outset. Thus, just as the Gordian Group representative had recommended, the Government did nothing and allowed Lakeshore to suffer the consequences. *See* A363 (¶11), A379. Lakeshore was damaged as direct and proximate result of the Government's breach of contract (A463-547), and is entitled to recover its damages for this breach. Accordingly, summary judgment on Lakeshore's breach of contract claim should be reversed.

**C.    The Court of Federal Claims Erred in Granting Summary Judgment on Lakeshore's Implied Warranty Claim.**

In this case the Government warranted that the non-negotiable UPB pricing, contained in Division 1-16 of the UPB, which was part of the Contract and specifications required under the Solicitation, fairly and accurately reflected current local rates for labor, materials and equipment. *See United States v. Spearin,*

248 U.S. 132, 136 (1918) (the government impliedly warrants the accuracy of matters set forth in contract documents); *E.L. Hamm & Associates, Inc. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004) ("Whenever the government uses specifications in a contract, there is an accompanying implied warranty that these specifications are free from errors."); *D.F.K. Enterprises, Inc. v. U.S.*, 45 Fed. Cl. 280, 285 (1999) (same). Where a contractor is bound by the "specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Spearin*, 248 U.S. at 136. To recover an equitable adjustment based upon an erroneous specification, the contractor must show it reasonably relied on the erroneous specification, and that it was misled by this error. *See E.L. Hamm*, 379 F.3d at 1338-39. Lakeshore alleged in its Amended Complaint, and the evidence shows, that these factors are met here.

In *E.L. Hamm*, for example, the court reversed the denial of a contractor's claim for an equitable adjustment based on a defect in an understated amount of acreage it was obligated to police under a maintenance contract with the Navy. 379 F.3d at 1342-43. This defect was not apparent on the face of the contract and the acreage amount was used by Hamm in preparing its bid. *Id*. It was only after performance under the contract for several months did Hamm realize the error in the acreage amount. *Id*. The court held that "[g]iven the Navy's implied warranty behind the figures in its solicitation, we conclude that Hamm rightfully used these

41

figures to compute its bid." *Id.* at 1343. Finding that Hamm had no reason to discern the error at the outset (*id.*), the court noted that "[o]nce Hamm's difficulty in keeping up with the policing work revealed the error in the solicitation, it properly had an expert use the drawings attached to the contract to submit a claim for an equitable adjustment. . . . [but] it did not initially have a duty to prepare take-offs from [the contract] drawings because of the implied warranty behind the figures given in the Navy's solicitation." *Id.*

This same analysis applies here. On its face, the UPB appeared to correctly reflect local pricing, as promised in the Technical Specifications in the Contract (A320); and as understood by the Government representatives who prepared the Solicitation, and who expected the bidding contractors to rely on that fact. *See, supra* at 26-30. Moreover, the Contract and Solicitation expressly defined the "business risk" coefficient adjustment factor as "other risk of doing business (*i.e.*, risk of lower than expected contract dollar value; risk of poor subcontractor performance and re-performance)" – a definition which **makes no reference whatsoever** to "inflation or material cost fluctuations" as elements to be included as part of the business risk factor in Lakeshore's bid coefficient.[7] In short, the Solicitation did not require that the bidders verify unit prices or to include cost

---

[7] As detailed above, the Contract and Solicitation did not list as an attachment Division 0 of the UPB, which included "inflation or material cost fluctuations" in its business risk definition, nor were these terms used anywhere within the Contract and Solicitation.

fluctuations or inflation in the bidders' coefficient and Lakeshore reasonably used the same factors listed in the Solicitation in determining its bid coefficient.

Moreover, Lakeshore relied on the Government's representation that the UPB pricing accurately reflected prevailing local rates for labor, materials and equipment. By affidavit attached to Lakeshore's response to the Government's summary judgment motion, Jignesh Patel, who, along with others, prepared Lakeshore's bid, explained that "[i]n determining [its] coefficients, Lakeshore accepted the Gordian Book prices . . . [and] compared those prices to its own average cost experience in other areas of the country to determine whether the average local cost should be adjusted to conform to the contractor's own average costs." A343. In so doing, "Lakeshore found that the UPB prices were low compared to Lakeshore's historical experience in other areas of the country and adjusted its bid coefficient 6% upward." *Id.* This price adjustment was not attributable to Lakeshore's knowledge of the true Fort Rucker local pricing, but rather "[i]n undertaking this task, Lakeshore did not perform an independent cost review at Fort Rucker or the Dothan, Alabama area. Lakeshore relied upon the Gordian Book prices as accurately reflecting the average local prices in the Dothan, Alabama area. This 6% upward adjustment had nothing to do with believing that the actual local prices were different than the UPB, because Lakeshore would not have known that one way or the other." *Id.*

At the least, there is a fact issue as to whether Lakeshore reasonably prepared its bid in reliance on the accuracy of the UPB. Lakeshore subsequently learned, however, that the prices in the UPB required it to perform construction work at prices substantially less that the prevailing local rates for the task orders issued by the Government to Lakeshore during the first two years of the Contract. A362-363 (¶¶7-10). This result was caused by the failure of the UPB pricing to accurately reflect prevailing local rates. A363 (¶11).

Accordingly, the Government, by including in the contract documents UPB pricing that failed to accurately reflect prevailing local rates, breached its implied warranty that the Contract documents and specifications would be complete, accurate, and free from error. Lakeshore was damaged as a direct and proximate result of the Government's breach of this implied warranty, and is entitled to pursue its claim for an equitable adjustment to the Contract on this basis. *E.L. Hamm*, 379 F.3d at 1342-43; *see USA Petroleum Corp. v. United States*, 821 F.2d 622, 624 (Fed. Cir. 1987) (where the quantity of fuel delivered was measured based on defective strapping tables selected by the government, the court held: "We conclude, applying the *Spearin* doctrine, that the government breached its implied warranty to provide accurate strapping tables and is responsible for the consequences of its breach."); *D.F.K. Enterprises*, 545 Fed. Cl. at 286-87 (denying the Army's summary judgment motion, holding that a chart entitled "Anticipated

Adverse Weather Delays" included in the contract documents constituted an "affirmative representation" that the "government had undertaken some analysis to determine the usual weather at the job site" upon which the contractor was entitled to rely in preparing its bid.).

**D.    The Court of Federal Claims Erred in Granting Summary Judgment on Lakeshore's Claim Based on Mutual Mistake of Fact. [8]**

Lakeshore is entitled to proceed on its claim of mutual mistake of fact because it can show that there exists at least a question of fact with respect to the four elements necessary to prove this claim, namely:

(1) the parties to the contract were mistaken in their belief regarding a fact;

(2) that mistaken belief constituted a basic assumption underlying the contract;

(3) the mistake had a material effect on the bargain; and

(4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas Corp. v. U.S.,* 895 F.2d 745, 750 (Fed. Cir. 1990) (other citation omitted);

*National Presto Indus., Inc. v. United States,* 338 F.2d 99, 107-09, (Ct. Cl. 1964).

---

[8] As Lakeshore learned in discovery, the Government, like Lakeshore, believed the UPB reflected local pricing and thus Lakeshore did not pursue its unilateral mistake claim in response to the Government's motion for summary judgment, nor does it appeal the trial court's determination on this issue.

1. **The parties to the Contract were Mistaken in their Belief regarding a Fact.**

The first factor is met by the evidence set forth above which shows that both Lakeshore and the Government mistakenly believed that the UPB fairly and accurately reflected local rates for labor, materials and equipment. *See, supra* at 9-11. The basic precept of contract law that the "intention of the parties to a contract control its interpretation" (*Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971)); *see also Alvin, Ltd. v. U.S. Postal Service*, 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties") (other citation omitted) "includes modification to correct a mutual mistake." *Beta Sys.*, 838 F.2d at 1185. Here, the unambiguous wording of the Contract, together with evidence of both parties' intent, shows that both parties mistakenly believed that the December 2006 UPB "modified for Ft. Rucker" accurately reflected current local pricing.

Just as there was a mutual mistake by both parties in assuming that the UPB prices accurately reflected prevailing local prices in 2007, there was also a mutual mistake in both parties' assumption that the Contract's inflation formula would adequately address inflation in the price of construction materials at Ft. Rucker during the second year of the Contract. Both parties were mistaken in their belief. *See, supra* at 9-13; 26-31; 32-36.

The parties' mistake in this case as to the accuracy of the UPB was a mistake of fact over (a) the accuracy of the UPB **at the time of contracting;** and (b) the parties' belief **at the time of contracting** that the UPB, together with the economic adjustment clause in the Contract, would be an accurate price index for the term of the Contract. The UPB was inaccurate from the outset due to the Gordian Group's failure to accurately update the December 2006 UPB (*see, supra* at 11-13), though neither party knew it at the time of the Solicitation and contract award. This plainly is a "mistake of fact".

Similarly, as to the extraordinary inflation that subsequently occurred, this was a mistake of fact over the accuracy of the Contract's economic adjustment clause applied to the UPB. *Id.* In *Aluminum Co. of America v. Essex Group, Inc.,* 499 F. Supp. 53 (D.C. Pa. 1980), the court allowed reformation based upon mistake (among other theories) due to extreme inflation, finding that the mistake was not one of prediction of future events, but rather was a mistake of fact over the accuracy of the index at the time of contracting; *i.e.,* the parties mistakenly believed the index used would be an accurate price index for the 21-year contract term. 499 F. Supp. at 63.

At the very least, whether the mistake regarding inflationary conditions was one of present fact or future prediction is itself a question of fact, not resolvable on summary judgment. *See, e.g., ALCOA,* 499 F. Supp. at 62 ("ALCOA calls the

47

mistaken assumption that the index was suitable a factual assumption. Essex calls it a prediction. This is a dispute of fact[], not law."). This is particularly true here, where Lakeshore relied on the UPB to accurately reflect local prices in determining its coefficient; and, pursuant to the terms set forth by the Government in the Contract, took into account certain business risks, but did not include inflation because this term was specifically eliminated by the Government in the Solicitation.

### 2. The Parties' Mistaken Belief Constituted a Basic Assumption Underlying the Contract and had a Material Effect on the Bargain.

The evidence shows that the accuracy of the UPB was a basic assumption underlying the Contract, having a material effect on the bargain between Lakeshore and the Government. The Government represented to all bidders that the non-negotiable UPB was "modified for Fort Rucker" and thus reflected local prices for labor, material and equipment, and that it was updated as of December 2006. A320-321; A341 (¶5), A349, A362 (¶5), A368. Indeed, the Solicitation required that the bidder's offer "shall be a coefficient" **applied to the UPB prices** (A341 (¶6), A291-292), thus the accuracy of the UPB pricing was essential to the Contract.

Lakeshore reasonably relied upon the fact that the UPB pricing accurately reflected prevailing local rates for labor, materials and equipment in bidding a

48

coefficient factor of 1.28 for the Base Year, which coefficient factor was intended to cover indirect costs associated with the UPB prices. SA3-4 (¶¶8-12). The parties' mistaken belief as to the UPB pricing was a basic assumption underlying the contract which materially affected the bargain between the parties.

**3.    The Contract did not put the Risk of the Mistake on Lakeshore.**

Nor does the Contract place the risk of mistake on Lakeshore in this case. Division 0 of the UPB (which contained the phrase "inflation or material cost fluctuations" in describing business risks) was not a part of the Contract and Solicitation; and no language in the Contract and Solicitation required that the bidders verify unit prices or include cost fluctuations or inflation in the bidders' coefficient. Lakeshore reasonably used the same factors listed in the Solicitation in determining its bid coefficient. *See* A341-343 (¶¶7-10); *see also* A343 (¶11) (recognizing it was a physical impossibility to check the unit prices, nor did the parties or Government know at the time of bidding the five-year contract what task orders would be issued by the Government during that five-year period.).

Lakeshore compared major items from the Gordian Book with its actual cost experience on past projects in other parts of the country and took this comparison into account in establishing its coefficient. This is precisely what a reasonable bidding contractor would do if it were relying upon the accuracy of the Gordian Book prices to reflect the local prices in the Dothan, Alabama area. The

49

reasonable bidder would accept the Gordian Book prices, which were represented to have been recently surveyed for the local market, as accurately reflecting the "average" local prices for materials, equipment and labor in that market, but it would compare those prices to its own average cost experience to determine whether the "average local cost" should be adjusted to conform to the contractor's own "average costs." The reasonable contractor would then take any difference in those averages into account in setting its coefficient. In undertaking this task, however, the contractor would, and Lakeshore in fact did, rely upon the Gordian Book prices as accurately reflecting the "average local prices" in the Dothan, Alabama area. *See* A342-343 (¶¶8-12).

In *Beta Systems, Inc. v. United States,* 838 F.2d 1179 (Fed. Cir. 1988), the Federal Circuit favorably recognized a claim based on mutual mistake of fact on facts analogous to those here. Beta Systems sought reformation of its contract with the government based on an alleged mutual mistake in the selection of a particular cost index for use in an economic price adjustment clause. *Id.* at 1185. Beta alleged that the Bureau of Labor (BLS) index identified in the contract for setting prices "was intended to be a fair measure of the economic situation actually confronting the contractor, as required by law, and that it was not." *Id.* at 1184. The BLS did not adequately account for the price of an aluminum alloy which was

a principal construction material in the units produced under the contract. *Id.* at 1185.

Reversing summary judgment in the government's favor, the court recognized that on "substantially identical" facts, the Board in *Polarad Electronics, Inc.*[9] "held that inclusion of an 'inappropriate and inadequate. . . price index in the escalation clause' constituted mutual mistake of a material fact, requiring correction by substitution of a proper index." *Id.* at 1186. The court noted that in the case before it, DAR 3-404.3(c)(3)c.5 (1981) required that "the EPA clause . . . accommodate inflationary/deflationary changes in the costs of labor and materials." *Id.* at 1185. Finding that "there is a legal presumption that the government did not intend to use an index that would violate the law as embodied in the DAR," the court held: "If the contract is in violation of the DAR, and does not meet the requirement that an index be selected that approximately tracks the economic changes affecting this contract, then reformation is appropriate." *Id.* at 1186.

Elaborating, the court explained that "[t]he risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor." Specifically, "[i]f the BLS index that was selected does not comply with DAR 3-404.3(c)(3)c.5, even approximately, it is not controlling whether or

---

[9]  ACAB No. 1116, 1971 WL 18012 (A.C.A.B. April 27, 1971).

not Beta or the government foresaw, or accepted the risk of failing to foresee, this defect in the index." *Id.* at 1185-86.

Other courts likewise allow reformation based on actual costs, where, as here, the parties mistakenly believed applicable prices were accurate. *See Southwest Welding & Mfg. Co. v. United States*, 373 F.2d 982, 990 (Ct. Cl. 1967) (allowing reformation based on actual costs where the parties mistakenly believed the price of steel was lower than it actually was and thus, the agreement, as written, impermissibly "conferred benefits upon the Government which neither party desired or intended"); *Walsh v. United States*, 102 F. Supp. 589 (Ct. Cl. 1952) (allowing reformation where parties mistakenly believed the minimum wage rate was a certain amount, though it had increased earlier); *Aluminum Co. of America v. Essex Group, Inc.*, 499 F. Supp. 53 (W. D. Pa. 1980) (allowing reformation where the parties erroneously believed that the Wholesale Price Index would accurately represent nonlabor production costs for the purpose of a contractual escalation clause).

Like the price index in *Beta Systems* and *Polarad Electronics, Inc.*, the escalation clause in this case was not a "fair measure of the economic situation actually confronting the contractor" in the local market (*Beta Systems,* 838 F.2d at 1184), and its inclusion in the Contract "constituted mutual mistake of a material fact. . . ." *Id.* at 1186, quoting *Polarad Electronics, Inc.*, ACAB No. 1116, 1971

WL 18012 (A.C.A.B. April 27, 1971). Likewise, as in *Beta Systems,* requiring Lakeshore to use the UPB when it did not reflect local pricing and an economic adjustment provision that did not take into account extraordinary inflation which occurred in that market to the very components required by the Government's task orders, violated applicable law and FAR regulations -- regulations which recognize, for example, that the Contract "permit a reasonable division of risk between the Government and the contractor" (FAR § 16.203-4(d)(iii)); and that such a remedy be available "when . . . there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance." FAR § 16.203-2; *see also, e.g.,* FAR § 16.203-3.

Further, and again as in *Beta Systems*, this Court and Lakeshore are entitled to rely on the legal presumption "that public officers perform their duties correctly, fairly, in good faith and in accordance with law and governing regulations." *See Short*, 65 Fed. Cl. at 799. Thus, this Court is entitled to presume that the Government, like Lakeshore, mistakenly relied on the UPB pricing and the accuracy of the escalation formula in its Solicitation and in awarding the Contract to Lakeshore on April 26, 2007[10] -- and may find reformation or other remedies are appropriate. *See Beta Systems,* 838 F.2d at 1186.

---

[10] This presumption would apply up until the time the Government learned of the local pricing discrepancies and extraordinary inflation.

In arguing against allowing Lakeshore relief on its mutual mistake claim, the Government relies on *ConocoPhillips v. U.S.*, 501 F.3d 1374 (Fed. Cir. 2007). That court found no mistake where the contracts "are very clear about the price that will be paid to the contractor and how that price will be adjusted;" and "specifically name the PMM as the source of the reference price." 501 F.3d at 1379-80. But the *ConocoPhillips* court **also** found that "the PMM constitute[d] a sufficiently accurate measure of 'established prices' to qualify as a permissible mechanism for price adjustment under FAR § 16.203-1(a)." *Id.* at 1378.

Unlike the PMM, the facts alleged in Lakeshore's Complaint show that Gordian Group UPB did not reflect accurate **local** prices, nor did inclusion of § 5152.237.9000 adequately address the extraordinary inflation that occurred in the first two years of the Contract. Moreover, in *ConocoPhillips* there were no e-mails from the Government's site representatives specifically acknowledging an inflationary spike in the cost of the very construction materials which comprised the core of the construction task orders awarded to the contractor. Nor were there e-mails from the Government's site representatives seeking an equitable means of addressing the inflationary spike so as not to penalize the contractor. Under these circumstances, there exists genuine issues of material fact relating to Lakeshore's mutual mistake claim, thus precluding summary judgment in the Government's favor on this issue.

**E.    The Government Breached its Obligations of Good Faith and Fair Dealing.**

The evidence addressed above also shows that the Government breached the covenants of good faith and fair dealing under the Contract.    Every contract impliedly obligates its parties to perform their duties in good faith -- a concept that also applies to the Government. *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005); *Short Bros., PLC v. U.S.,* 65 Fed. Cl. 695, 799 (2005).    In this case, once the Government learned (i) that the UPB pricing it imposed did not accurately reflect the promised "local pricing;" and (ii) that the Contract did not adequately compensate Lakeshore in the light of an inflationary spike for construction materials making up the core of the construction task orders awarded Lakeshore, it was incumbent upon the Government in dealing fairly and in good faith with LES to recognize the mutual mistake and the breach of implied warranty and to modify the Contract accordingly.

In fact, the Government's site representatives recognized as much when they sought input from Gordian to modify the prices, and then criticized Gordian for recommending no price adjustment.    As stated by the Government representative Charles Baldwin:

> Kristina [the Gordian Group representative] has an attitude.    She obviously looks down on contractors as a lower class beings (sic) than herself.    This issue will remain open until I can find the time to do some research and do a realistic evaluation of the situation.    When I get this done I will issue a Contracting Officer's decision on the

55

matter. If I find merit in Kristina's narrow versioned opinion I will admit it, if not I will offer a rebuttal and we will figure out where to go from there.

A421.

The Government's refusal to equitably adjust the Contract after it learned the true facts of the situation violates the well-established principle recognized in *Centex Corp.*: "The covenant [of good faith and fair dealing] imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance **and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.**" *Centex*, 395 F.3d at 1304 (emphasis added) (other citations omitted); *Precision Pine & Timber, Inc. v. U.S.,* 596 F.3d 817, 829 (Fed. Cir. 2010) (The Government cannot "reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.").

"The duty [of good faith and fair dealing] applies to the government just as it does to private parties" (*Centex,* 395 F.3d at 1304), thus cases involving private parties in which the courts have recognized that the plaintiff has furnished sufficient facts to state a breach of the implied covenant of good faith and fair dealing in analogous circumstances apply here. *See C&E Servs. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 262-263 (D. D.C. 2007) (recognizing claim for breach of implied covenant of good faith and fair dealing where plaintiff entered into

agreement with defendant to become a distributor of defendant's water treatment products and plaintiff subsequently learned that the pricing of defendant's products had been deemed defective under a General Services Administration audit); *JOC, Inc. v. ExxonMobil Oil Corp.*, 2010 U.S. Dist. LEXIS 32305, **20-21 (D.N.J. Apr. 1, 2010) (recognizing claim for breach of good faith and fair dealing where one party has discretion in setting contract pricing based on allegations that pricing was set unreasonably "with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. . . ."); *Bob's Shell, Inc. v. O'Connell Oil Assocs.*, 2005 U.S. Dist. LEXIS 21318, **23-24 (D. Mass. Aug. 31, 2005) (recognizing claim for breach of implied covenant of good faith and fair dealing based on showing that defendant set prices higher for franchisee-plaintiffs than for defendant's own retailers in that "a reasonable jury could conclude that Defendant tampered with Plaintiffs' ability to receive the fruits of their Dealer Agreements by charging excessive prices and forcing Plaintiffs out of business.").

The evidence shows that in contravention of the Government's contractual obligations, the Government did not act in good faith or deal fairly with Lakeshore in administering the Contract. Instead, the Government (i) purposefully and

intentionally required Lakeshore to perform under the Contract based on pricing from the non-negotiable UPB which, during the course of the Contract, the Government knew did not fairly and accurately reflect local prices for labor, materials and equipment; and (ii) purposefully and intentionally refused to equitably adjust the UPB. Despite repeated requests from Lakeshore for an equitable adjustment under the Contract due to the UPB's failure to accurately reflect local prices for labor, material and equipment, the Government continued to compel Lakeshore to perform under the Contract using the UPB pricing schedule. A363 (¶11), A379.

Because Lakeshore received the right under the Contract to be paid prices that fairly and accurately reflected local prices for labor, materials and equipment (*see, supra* at 18-32) and the ability to receive an equitable adjustment for unforeseen inflationary conditions (*id.* at 32-37), the Government's failure to abide by these material terms was an obvious denial of "the benefits [Lakeshore] expected to obtain from the transaction" (*Precision Pine,* 596 F.3d at 829) which "destroy[ed] [Lakeshore's] reasonable expectations . . . regarding the fruits of the contract" (*Centex,* 395 F.3d at 1304), in breach of the Government's good faith and fair dealing obligations under the Contract. Summary judgment on this issue should be reversed.

## CONCLUSION

For all the reasons addressed above, Appellant Lakeshore Engineering Services, Inc. respectfully requests that the trial court's granting of summary judgment in the Government's favor be reversed and this case remanded for a trial on the merits.

LAKESHORE ENGINEERING SERVICES, INC.

By: */s/ LeAnn W. Nealey*
LEANN W. NEALEY
leann.nealey@butlersnow.com

*ONE OF ITS ATTORNEYS*

OF COUNSEL:
PHIL B. ABERNETHY
**BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC**
1020 Highland Colony Parkway, Suite 1400 (39157)
P.O. Box 6010
Ridgeland, MS 39158-6010
Telephone: 601-948-5711
Facsimile: 601-985-4500
Phil.abernethy@butlersnow.com

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on Aug 7, 2013
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

| | |
|---|---|
| LeAnn W. Nealey | /s/LeAnn W. Nealey |
| Name of Counsel | Signature of Counsel |

Law Firm  Butler Snow O'Mara Stevens & Cannada, PLLC

Address  Post Office Box 6010

City, State, ZIP  Ridgeland, MS 39158

Telephone Number  601.948.5711

FAX Number  601.985.4500

E-mail Address  leann.nealey@butlersnow

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,568 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

*/s/ LeAnn W. Nealey*
LeAnn W. Nealey

Attorney for Appellant

Dated: July 30, 2013

# ADDENDUM

**Opinion** ......................................................................................... **ADD-1**

**Judgment** ...................................................................................... **ADD- 2**

ButlerSnow 17117808v1

# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔩𝔞𝔦𝔪𝔰

No.  09-865C

(Filed:  April 3, 2013)

---

| | |
|---|---|
| LAKESHORE ENGINEERING SERVICES, INC., | * Contract case; Motion for summary judgment; |
| | * ID/IQ contract, with fixed-price task orders; |
| | * Use of price book with bidder's coefficient; |
| Plaintiff, | * Army neither contracted nor warranted that |
| | * prices in price book accurately reflected local |
| v. | * prices; Instructions for using price book |
| | * included in solicitation by necessary |
| THE UNITED STATES, | * implication; Risk of price understatement on |
| | * contractor; No breach of the covenant of good |
| Defendant. | * faith and fair dealing; No mutual mistake or |
| | * unilateral mistake; Reformation denied; |
| | * Equitable adjustment denied. |
| | * |

---

**OPINION**

---

*Phillip B. Abernethy*, Butler, Snow, O'Mara, Stevens and Cannada, PLLC, Ridgeland, MS, for plaintiff.

*Jane C. Dempsey,* Civil Division, United States Department of Justice, with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

This contract case is before the court on defendant's motion for summary judgment. Lakeshore Engineering Services, Inc. (Lakeshore or plaintiff) was awarded an Indefinite-Delivery/Indefinite Quantity contract to provide, via job orders, constructions services to the U.S. Army (the Army) at Fort Rucker, Alabama (Fort Rucker). The Solicitation for this contract anticipated that the price of task orders would be set by multiplying the prices in a specified pricing book by a bidder's coefficient. Lakeshore claims that it was misled by the Solicitation into believing that the prices in the pricing book accurately reflected local prices at Fort Rucker. It asserts that, instead, those prices significantly understated the costs of certain materials and that the various adjustment clauses in the contract failed to account for these differences. It claims that it is entitled to an equitable adjustment essentially equal to the difference between its

ADD-1

actual costs and the prices set under the contract. Finding that neither the terms of the contract, nor any implied warranties or covenants provide a basis for such an adjustment, the court hereby **GRANTS** defendant's motion for summary judgment and orders this case dismissed.

## I.   BACKGROUND

In December 2006, the Army issued Solicitation Number W911SE-07-R-007-002 (the Solicitation) for an indefinite delivery/indefinite quantity, fixed price, job-order contract (the Contract) for repair, maintenance, and construction services in support of the Directorate of Public Works located at Fort Rucker. The job was to be conducted over one base year and four one-year options, for a total of five years. The contractor was to provide "all materials, supplies, job site supervision, labor, construction equipment, required safety equipment, barricades both lighted and unlighted, except that specified as Government-furnished, to repair, construct real property facilities and provide related work as specified, at Fort Rucker, AL, and satellite installations." The Solicitation indicated that the guaranteed minimum quantity of work under the Contract for task orders would be $300,000.

The Solicitation informed that the pricing portion of offers would take the form of three coefficients – one each for work during normal hours on pre-priced items; overtime work on pre-priced items; and non-pre-priced items. For the pre-priced items, the coefficient was to be "multiplied by the unit prices listed in a Universal Unit Price Book (UUPB) to price a job or project on individual job orders. According to the Solicitation, the coefficient was: "a numerical factor that represents costs (generally indirect costs) not considered to be included in the [UUPB] prices, e.g., general and administrative and other overhead costs, insurance costs, bonding and alternative payment protection costs, protective clothing, equipment rental, and contractor's profit." The Solicitation said the offeror's coefficient should account for a wide variety of risks of doing business,[1] adding at a later point, the coefficient "shall contain all allowable contractor costs, including contingencies and profit."[2] It further stated that the "offeror's coefficient shall

---

[1]   These included, but were not limited to, the following: contractor's overhead and profit; insurance; bonding; taxes; licenses and fees; waste and excess materials; mobilization; compliance with environmental and safety laws; project management; and a variety of other overhead items.

[2]   In this regard, the Solicitation further stated:

Examples of such costs are: gross receipts taxes, payroll taxes (FICA, workmen's compensation, state and federal unemployment taxes for direct payroll employees, etc.), superintendents' salaries, builders' risk insurance, initial contract startup mobilization, demobilization expenses, and bond premiums. Offered coefficient shall also contain various overhead expenses, including, project estimating, site office overhead, field office building, furniture, equipment, on-site office staff salaries, vehicle and construction equipment maintenance, office administrative

contain all costs other than the pre-priced unit prices, as no allowance will be made after award."[3]  The Solicitation, however, allowed for adjustments in the coefficient for the option years, to be based on the Engineering News Record building Cost Index (BCI), in accordance with the Economic Price Adjustment Clause, Army Federal Acquisition Regulation Supplement (AFARS) 5152.237-9000.[4]

The Solicitation designated the Gordian Group Construction Task Catalog (the Gordian Catalog) and PROGEN Online as the UUPB and accompanying software, respectively, to be "used by the contractor in development of price proposals for individual Task Orders." According to the Solicitation's technical specification, "[t]he UUPB, modified for Fort Rucker, contains pricing information (i.e., Government Estimate) for the description of work to be accomplished and for the units of measure specified."  This segment further indicated that the "UUPB consists of Divisions 1 through 16 that are applicable to Divisions 1 through 16 of the Job Order Contract Technical Specifications."  It additionally specified that the "UUPB modified for Fort Rucker contains unit pricing data to be used by the Contractor in development of price proposals for each work order," adding that "[t]he pricing data is presented as basic items and as price adjustment modifiers to the basic item."

---

expenses, and a proportional share of home office overhead.  The coefficient shall also include all insurance, special clothing for workers, traffic barricades, additional supervision, as well as, paperwork fees associated with a particular delivery order, for example, asbestos removal plan, lead abatement plan, consultant fees, all on and off site storage, etc.

[3]  The Solicitation indicated that items not listed in the UUPB (denominated "non pre-priced" or NPP) were to be "proposed in bare cost only (material, equipment and labor) multiplied by the quantity and the non pre-priced coefficient to arrive at the total price for the NPP."  The coefficient for the NPP was to "include all items associated with performing the non-prepriced tasks other than bare costs."

[4]  This clause describes the process for adjusting the coefficient for option years thusly:

An economic adjustment will be applied to the contract coefficient(s) addressing changes in the cost of labor, equipment and material in the Unit Price Book (UPB) (this includes consideration of Davis Bacon issues).  This allows for economic increase or decrease of the prices in the UPB and serves to adjust line item prices by the percentage increase or decrease of the economic trend in the construction market.  The economic price adjustment will be based on the Building Cost Index (BCI) found in the Market Trend pages of the Engineering News Record (ENR).  The economic adjustment is not applied to the cost items comprising the coefficient.  No upward adjustment shall apply to task orders awarded prior to the effective date of the adjustment, regardless of the date of commencement of work thereunder.

- 3 -

The Solicitation specified how the contractor, in the technical portion of its proposal, was to demonstrate technical acceptability, including bonding capabilities, as well as provide information on contract management, technical staff ability, and comprehension of requirements. The last of these was to take the form of a detailed cost proposal based on information contained in a sample scope of work, including an explanation and breakdown of line items used from the UUPB and of any non-prepriced item included in the sample proposal. Offerors were also to provide information on relevant experience and past performance. The Army was to consider all of this information in evaluating the technical portion of the offers. The evaluation segment of the Solicitation further described the steps the Army would use to evaluate the offerors' price proposals, principally focusing on how the pre-priced coefficient would be examined. For this purpose, the Solicitation made various assumptions, *e.g.*, that $4 million would be the notional requirement for the base year,[5] that certain amounts of work would be performed in other than normal working hours, etc. The Solicitation indicated that "award will be made to the lowest priced offeror who is technically acceptable."

The Solicitation had five attachments, including "ATCH 2 – Progen Unit Price Book (UPB), Divisions 1 through 16." These divisions of the Gordian Book, which covered a wide range of construction activities,[6] were attached to the Solicitation in the form of two volumes. Each volume opened with a table of contents, both of which listed an introductory section numbered "0000," entitled "Using The Construction Task Catalog." This introductory section, repeated in each of the two volumes attached to the Solicitation, explained that "this catalog was created specifically for Fort Rucker, Alabama, and published in December 2006," and the unit prices included labor costs, equipment costs, and material costs. The section listed costs that the unit prices did not encompass and which, therefore, were to be included in the contractors' coefficient.[7] This description was similar, but not identical, to that in the Solicitation itself. Specifically, the book's discussion of business risk stated that the coefficient should include "business risks such as the risk of a lower than expected volume of work, smaller than anticipated Job Orders, poor Subcontractor performance, and inflation or material cost fluctuations."

---

[5] Regarding the $4 million, the Solicitation was quick to add that "[t]his figure is for prepriced coefficient evaluation only and may not reflect the actual dollar amount of projects delivered during the contract period."

[6] Among the areas covered were site work, concrete, masonry, metals, wood and plastic, thermal and moisture protection, doors and windows, finishes, specialties, equipment, furnishings, special construction, conveying systems, mechanical, and electrical. Within each of these chapters, there were hundreds and, in some instances, thousands of items.

[7] The section referred to the coefficient as an "Adjustment Factor."

This same section of the Gordian Book warned that:

> Contractors may find differences in labor, equipment material costs due to certain economic factors. Variations in labor cost can also result from labor efficiency, labor restrictions, working conditions and local work rules. Variations in material costs can also result from the quantity of material purchased, the existing relationship with suppliers, and because the materials have been discontinued or have become obsolete.

Based on these caveats, the section proceeded to state that: "[w]hile diligent effort is made to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." Like the Solicitation, the Gordian Book provided that the list of costs to be included in the coefficient was "not exhaustive" and that "no additional payments of any kind whatsoever will be made," adding again that "[a]ll costs not included in the unit prices must be part of the Adjustment Factors."[8]

In March, 2007, Lakeshore submitted its offer to the Army, with a coefficient of 1.28 for normal working hours, 1.46 for overtime working hours, and 1.22 for non pre-priced items. In its offer, Lakeshore indicated that it "agrees with all terms, conditions, and provisions included in this solicitation." It represented that it was, at that time, the prime contractor on five similar contracts, and had, in the prior five years, completed more than 1,500 task orders valued at more than $100 million. In its pricing proposal, Lakeshore explained the breakdown of its coefficient. In a segment entitled "Our Perception of Unit Price Book (UPB)," it represented –

> We have thoroughly reviewed the UPB and compared major line items with our actual cost experience on past projects. Overall the UPB prices are less than our actual past cost experience.

In a segment entitled "Development of Coefficient and Basis of Cost," Lakeshore further indicated that –

> In order to develop the coefficient, we decided to perform a sample analysis of the cost factors for a known past renovation project. We provided the scope of work to our major subcontractors and obtained their prices. Similarly, our in-house estimator prepared an estimate based on Unit Price Book.

---

[8] Although Section 00 was not specifically referenced in the Solicitation, the sections that are referenced therein make references to this section. For example, on the opening page of Section 01, the book includes a note defining "reimbursable Fees," which states that they "include but are not limited to permits, special inspections, special insurance, additional warranties, etc., which are not included in a task or an Adjustment Factor as explained in the Contract or The Construction Task Catalog®."

Lakeshore provided an exhibit summarizing the results of this internal exercise, which examined, *inter alia*, the "'sensitivity' of the coefficient if workload varies." It represented that the weighted average of coefficients under this exercise was 1.295, leading it to propose a coefficient of 1.28 for normal working hours at Fort Rucker. The proposal contained a similar set of representations regarding plaintiff's study of overtime hours, leading it to propose a coefficient of 1.46 for overtime hours at Fort Rucker.

On April 26, 2007, the Army awarded the Contract to Lakeshore. The Contract included all terms, conditions and provisions set forth in the Solicitation. In the base year, Lakeshore performed 79 construction delivery orders, the first of which was issued on July 25, 2007. For each of these orders, the parties followed the same process: the Army requested Lakeshore to submit a detailed cost estimate for the proposed work based upon the unit prices in the Gordian Book. After receipt of those estimates, the Army compared them to its own cost estimate and the parties then conducted negotiations regarding what was needed to complete the work. The parties then executed a delivery order, each of which provided "a Firm Fixed-Price for the performance of the work described," as specified in the Contract.

On April 27, 2008, the Army awarded the first option year to Lakeshore. Pursuant to the economic price adjustment clause, the coefficient factors were adjusted upward by four percent, such that the coefficient factor for normal working hours became 1.32. During that contract year, Lakeshore performed 74 construction delivery orders. Each of these orders were generated using the process described above.

On March 10, 2009, plaintiff filed a claim for equitable adjustment with the contracting officer (CO) pursuant to the Contract Disputes Act of 1978 (the CDA), 41 U.S.C. § 601, *et seq.*, seeking recovery of $1,996,152.40 for losses it incurred performing in the base year and first option year. The claim alleged that Lakeshore had lost "a tremendous amount of money because it was compelled to perform under the [Contract] utilizing the Gordian UPB pricing schedule." On June 25, 2009, the CO issued a final decision denying recovery. On December 15, 2009, plaintiff filed its complaint in this court, which was amended on April 19, 2011. Defendant filed its motion for summary judgment on January 13, 2012. Briefing and oral argument on that motion have been completed.

## II.    DISCUSSION

We begin with common ground. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

Lakeshore argues that the United States breached the Contract and its implied duty of good faith and fair dealing by: (i) not utilizing a price index that fairly and accurately reflected local rates for labor, materials, and equipment; (ii) not allowing adjustments to that index for "extraordinary inflationary circumstances;" and (iii) not adjusting the first option-year coefficient in a way that complied with the contract's requirements. Plaintiff further alleges that the United States breached an implied warranty that the Contract specifications would be free from error by using the UUPB. Finally, plaintiff argues that either the parties entered into the Contract as a result of mutual mistake of fact – a mistaken belief that the UUPB was accurate for Fort Rucker – or that Lakeshore entered into the Contract as a result of this mistake, and that the government knew or should have known of Lakeshore's mistake. The court will consider these claims *seriatim*.

Most of plaintiff's pricing claims begin – and end – with the provisions of the Contract. To determine what that agreement reveals, we begin, as we must, with the Contract's plain language. *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004); *see also Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). "If the provisions of the [contract] are clear and unambiguous," the Federal Circuit has stated, "they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." *Banknote Corp.*, 365 F.3d at 1353. In addition, a contract should be interpreted in a manner that harmonizes and gives reasonable meaning to all its parts. *Id.* "Provisions of a contract must be so construed as to effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991); *see also Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). An interpretation that gives a reasonable meaning to all provisions of a contract thus is preferable to one that leaves a portion of it useless or inexplicable. *Gould, Inc.*, 935 F.2d at 1274; *see also Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 537-38 (2011); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 707-08 (2010). Context thus defines the meaning of any given term or provision in a government

contract. *Id.* at 708 (citing *Metric Constructors*, 169 F.3d at 752); *see also Fulcra Worldwide*, 97 Fed. Cl. at 537-38.

In various ways, Lakeshore complains that the Army utilized a pricing book that did not reflect local prices, particularly after Hurricane Katrina. However, Lakeshore cannot point to anything in the Solicitation or resulting contract that indicates that the Army ever assumed the obligation to provide offerors with accurate local prices, or the economic consequences if one or more prices in the guide proved inaccurate. The Contract made clear that the coefficient was to reflect "risks of doing business" and that this figure "shall contain all costs other than the pre-priced unit prices, as no allowance will be made after award." Moreover, the Gordian Book used under the Contract flatly warned prospective offerors that while Gordian used "diligent effort . . . to provide accurate and reliable up-to-date pricing, it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." That same book further cautioned that the coefficient should include business risks such as "inflation or material cost fluctuations." Plainly, these provisions should have put plaintiff on notice that it, and not the Army, bore the risk that the prices in the Gordian Book might be too low – a possibility that plaintiff could have accounted for by examining the prices in the book and setting its coefficient appropriately.

Lakeshore, for its part, stresses that the caveats regarding the accuracy of the prices made in the Gordian Book were in an introductory segment to that publication that was not specifically incorporated into the Solicitation. Plaintiff, of course, is right that the Solicitation explicitly refers to all of the chapters in the Gordian Book save the introductory chapter that describes how to use the book (Chapter 0000), within which are the various caveats regarding the accuracy of the prices listed in the book. The court, however, does not believe this makes a difference here for several reasons.

First, it is reasonable to believe that when the Solicitation incorporated by reference the other chapters in the Gordian Book, it incorporated, by necessary implication, the instructions in the introduction regarding how to use those chapters. Those instructions were extensive and essential to the use of the book, providing detailed information regarding: (i) what was and was not included in various unit prices; (ii) the extent to which the unit prices included, *inter alia*, delivery, movement of material, imported materials (*e.g.*, sand and soil), fasteners, and testing and calibration; and (iii) what was and was not covered in terms of demolition costs. The instructions also provided a detailed explanation of what was covered by the coefficient, in terms of business costs and construction-related cost; it was within this segment, under the title of "Price Variations," that readers would find the passages warning about the accuracy of price information and the need for contractors to verify the prices contained in the book. Lastly, the introduction provided a series of "General Interpretations" to be applied in using the prices in the catalog, including instructions on how to calculate quantity discounts; how to choose between alternative tasks to accomplish the same purpose; how to deal with situations in which the catalog specified materials or equipment by reference to specific manufacturers or vendors; how to construe the various specifications for tasks; and how to apply the units of measure employed throughout the book. All told, these instructions went on for eight detailed pages, making it

- 8 -

inconceivable that anyone could appropriately or effectively use the Gordian Book without referring repeatedly back to these provisions.

Given the organization of the Gordian Book, the court must conclude that in incorporating the chapters containing the pricing information, the Solicitation necessarily incorporated the instructions needed to interpret that information. *See Lusk v. Lyon Metal Prods.*, 247 S.W.2d 617, 621-22 (Mo. 1952) (contract incorporated by necessity portions of pricing manual that were needed to effectuate the provisions of the manual that were specifically referenced in the contract); *see also Johnston Bros v. Village of Coopersville*, 246 N.W. 551, 552 (Mich. 1932) (contract included unreferenced, but attached, printed matter regarding pump warranties because "[t]he contract without such matter is incomplete"). The instructions to the Gordian Book could not be clearer in indicating that "it is the responsibility of the Contractor to verify the unit prices and to modify their Adjustment Factors accordingly." Plainly, plaintiff understood this. In its pricing proposal, it represented that it had "thoroughly reviewed the UPB and compared major line items with [its] actual cost experience on past projects" and had determined that "[o]verall the UPB prices are less than our actual past cost experience." It further averred that, in developing its coefficients, it had "perform[ed] a sample analysis of the cost factors for a known past renovation project" and "provided the scope of work to [its] major subcontractors and obtained their prices." Indeed, in deposition testimony, one of Lakeshore's officials admitted that he had conducted a side-by-side comparison of the 2005 and 2006 Gordian Books. While the record suggests that some of the representations made by plaintiff in its proposal may have been puffery, it remains clear that plaintiff understood that there was a relationship between the accuracy of the prices in the Gordian Book and what it should bid in terms of a coefficient. It should not be heard to argue otherwise now, after-the-fact, when it is convenient to do so.[9]

Plaintiff's vaunted attempts to place the risk of pricing errors entirely on the shoulders of the Army cannot be reconciled with several of the Contract's provisions. The first, of course, are those indicating that this was a fixed-price contract, including one provision that, in describing how task orders would be issued, explicitly stated "[t]he Task Order is a Firm Fixed-Price for the performance of the work described." Consistent with this intent, the Contract does not contain any of the Federal Acquisition Regulation provisions that typically would be used by a

---

[9]  Plaintiff complains that it "would have been impossible to verify the unit prices" in the Gordian Book, noting that it did not know what the future task orders would be and thus did not have time to review all 70,000 unit prices listed in the book. But, plaintiff, of course, did attempt to verify the prices it believed were most important to its success under the Contract. As was said in *ConocoPhillips v. United States*, 501 F.3d 1374, 1379 (Fed. Cir. 2007), in which the plaintiff complained that the contract contained an index for fuel that did not reflect market prices: "[i]f the plaintiffs had felt that a different method of adjusting market prices would be more appropriate and if the issue was sufficiently important to them, they could have objected to the use of the [index]; if the government had insisted on using the [index], they could have declined to enter into the contracts."

contracting officer to analyze the allowable costs under a cost-reimbursement arrangement. *See, e.g.*, 48 C.F.R. §§ 16.307 (cost-reimbursement contracts); 52.216-7 (allowable cost and payment clause). Without such guidance, plaintiff simply would have this court award it the difference between what it expended and what it charged under the Contract – effectively guaranteeing it a profit, albeit without any mention of correlating adjustments for instances in which the price in the Gordian Book exceeded plaintiff's actual cost. There is no reason to believe that the Contract was intended to "bind the government to such a one-sided arrangement." *ConocoPhillips*, 501 F.3d at 1379. Second, the Contract quite explicitly indicates that the coefficient was designed to deal with a variety of business risks.[10] It provided a formula for adjusting the coefficient to deal with changes in the cost of equipment, labor, and materials, and stressed that no other "allowance will be made after award." These provisions are consistent with a fixed-price contract, under which the contractor "assumes the risk of unexpected costs." *ITT Arctic Servs. v. United States*, 524 F.2d 680, 691 (Ct. Cl. 1975); *see also Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1579 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951 (1998). All these provisions would be rendered surplusage if, beyond the compensation specified in the Contract, the contractor were entitled to an adjustment to account for costs in excess of the prices listed in the Gordian Book. These provisions, rather, made clear that Lakeshore bore the risk of cost increases or unanticipated inflation, which it was to consider in setting its coefficient.[11] This court will not imply into the contract provisions that contradict those actually contained therein. *See Gardiner, Kamya & Assocs. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (requiring the court to "interpret [a contract] as a whole and 'in a manner which . . . avoids conflict'"); *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997).

Nor can plaintiff reach the same point, economically-speaking, by asserting instead that defendant, by failing to adjust the prices, breached the covenant of good faith and fair dealing. Having explicitly agreed to the provisions in the Contract dealing with pricing, plaintiff cannot now contend that defendant violated the covenant of good faith and fair dealing merely by enforcing the same. To be sure, a breach of the good faith covenant can be established by a showing that defendant "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). While plaintiff may show a breach of the covenant without

---

[10] Plaintiff would limit these business risks to those specifically listed in the Solicitation and notes that the listed risks did not include the risk that the prices in the 2006 Gordian Book were wrong. However, the Solicitation indicated that the risks to be factored into the bidder's coefficient included, but were "not . . . limited to" the business risks listed.

[11] Notably, some contracts contain adjustment provisions for unanticipated inflation. *See, e.g.*, *Brunswick Corp. v. United States*, 951 F.2d 334, 335 (Fed. Cir. 1991). Unfortunately for plaintiff, this one did not.

demonstrating a corresponding violation of the underlying agreement,[12] it cannot do so without some evidence that defendant acted "'to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Info. Sys. & Networks*, 81 Fed. Cl. at 740 (quoting *Centex*, 395 F.3d at 1304); *see also Mkt. St. Assocs., L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991) (Posner, J.) (indicating that a breach of the covenant occurs when there has been "sharp dealing"); *Dobyns v. United States*, 91 Fed. Cl. 412, 421 (2010). Here, there is no such evidence – unless one accepts plaintiff's argument that bad faith is exhibited by defendant's failure to grant plaintiff the equitable adjustment in question. This court, however, is not prepared to turn the covenant analysis into a syllogism, in which a breach of the covenant occurs any time the government refuses to make whole a contractor that performs a contract at a loss.[13]

Contrary to plaintiff's claims, there is no indication that the Army breached the Contract in failing to adjust plaintiff's coefficient. The FAR explains that "[a] fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203-1(a); *see also Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States*, 87 Fed. Cl. 113, 124 (2009). For this purpose, the Contract incorporates AFARS 5152.237-9000, which provides that the economic price adjustment of the coefficient "will be based on the Building Cost Index (BCI) found in the Market Trend pages of the Engineering News Record (ENR)." Plaintiff provides no evidence that this clause was applied improperly here. Rather, its claim on this count is yet another variation on the theme that defendant should have adjusted the contract prices to reflect plaintiff's actual costs. The FAR, indeed, contains economic-price-adjustment clauses that

---

[12] *See Centex Corp.*, 395 F.3d at 1304; *Jay Cashman, Inc. v. United States*, 88 Fed. Cl. 297, 308 (2009); *Info. Sys. & Networks Corp. v. United States*, 81 Fed. Cl. 740, 750-51 (2008), *aff'd*, 356 Fed. Appx. 410 (Fed. Cir. 2009); *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007).

[13] Plaintiff relies upon the warranty of specifications doctrine established in *United States v. Spearin*, 248 U.S. 132, 136 (1918), to contend that the Army "warranted that the non-negotiable UPB, which was part of the Contract and specifications required under the Solicitation, fairly and accurately reflected local rates for labor, materials, and equipment." *Spearin* "sets forth the rule that a contractor bound to build according to government plans and specifications is not responsible for the consequences of defects in those plans and specifications." *Holmes v. United States*, 657 F.3d 1303, 1315 (Fed. Cir. 2011). That doctrine, however, is limited to situations in which "the contractor is bound to build according to plans and specifications prepared by the owner." *Spearin*, 248 U.S. at 136; *see also Hercules, Inc. v. United States*, 24 F.3d 188, 197 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996). That is not the case here. The doctrine, moreover, does not apply where the contract's design specifications are fine and it is possible to perform the task identified – "[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Spearin*, 248 U.S. at 136. That is the case here.

would have approximated that result, *see, e.g.*, 48 C.F.R. § 52.216-4. But, contrary to plaintiff's claim, those clauses were not included in the Contract.

Lastly, plaintiff seeks reformation of the Contract based on a mutual mistake or a unilateral mistake. This claim too must be rejected.

In order to make out a claim for mutual mistake, the party advocating reformation must prove four elements: (i) the parties to the contract were mistaken in their belief regarding a fact; (ii) that mistaken belief constituted a basic assumption underlying the contract; (iii) the mistake had a material effect on the bargain; and (iv) the contract did not put the risk of the mistake on the party seeking reformation. *See Bank of Guam v. United States*, 578 F.3d 1318, 1329-30 (Fed. Cir. 2009), *cert. denied*, 130 S. Ct. 3468 (2010); *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990)). As these factors reflect, reformation for mutual mistake is available "'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.'" *Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 903-04 (7th Cir. 2002) (quoting Restatement (Second) of Contracts, § 155 cmt. a (1981)).[14] Generally, the elements of a claim for reformation must be proven by clear and convincing evidence. *See, e.g.*, *Phil. Sugar Estates*, 247 U.S. at 391 (stating that reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character"); *see also* 27 Williston on Contracts § 70:54 (4th ed.) (stating that "the preferred way of appraising the quantum of proof" in reformation cases "is to state quite simply that the evidence must be clear and convincing"); Restatement (Second) of Contracts § 155 cmt. c (1981).

Plaintiff has failed to produce evidence to support several of its claims on this theory. For one thing, it has failed to support its assertion that there was any mistake of fact here, *i.e.*, "a belief that is not in accord with the facts." *Atlas*, 895 F.2d at 750; *see also Short Bros., PLC v. United States*, 65 Fed. Cl. 695, 796 (2005). Principally, the record lacks support for plaintiff's claim that, in any comprehensive way, the prices in the Gordian Book failed to reflect local prices. On this count, plaintiff primarily relies on the fact that its costs exceeded those in the Gordian Book, but this is proof neither that its costs were reasonable nor that there was any systematic problem with the prices in the book. Rather, while the record suggests that some prices in the book may have been below market, plaintiff has provided no evidence, one way or the other, as to the accuracy of the wide majority of the prices in that book – having some degree of inaccuracy is not unusual when it comes to contracts of this sort, which necessarily anticipate some time delay between the issuance of a price guide and the performance of a particular task

---

[14] *See also Phil. Sugar Estates Dev. Co. v. Gov't of Phil. Islands*, 247 U.S. 385, 389 (1918) ("[i]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties"); *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006).

order. Certainly, plaintiff has failed to provide any proof that the Gordian Book systematically understated the costs of labor, equipment and materials at the time the Contract was issued.[15] Indeed, the record reveals that plaintiff realized a profit in performing a large number of the task orders, suggesting that the prices as to the items, equipment and services associated with those orders were not below market.

Likewise, plaintiff has failed to support its claim that the Army mistakenly believed that Gordian had updated their book, when it had not. In fact, the Gordian firm did update their book in 2006, but focused only on what it called "material price indicators" and did not review all 70,000 prices therein. Moreover, to the extent that there were some prices in the Gordian Book that were low, the record contains admissions by plaintiff's officers that Lakeshore knew this was the case before it submitted its offer. Indeed, it appears that, prior to submitting that offer, plaintiff had: (i) been in contact with the prior contractor on this contract, who had likewise complained about the prices in the Gordian Book being low; and (ii) compared on a "side-by-side basis" the 2005 version of the Gordian Book with the 2006 version.[16]

––––––––––––––––––––

[15] Plaintiff submitted an affidavit by one of its vice presidents claiming that the "prices in the Gordian Book were not accurate nor reflective of local prices for labor, materials, and equipment costs." The only specific information provided with this affidavit (principally dealing with increases in the price of steel), however, deals with price increases that occurred after the contract was issued. Moreover, plaintiff's damages expert made clear at his deposition that he made no comparisons of this sort, but rather simply assumed that plaintiff was entitled to the difference in the costs it incurred versus those reflected in the Gordian Book.

[16] In his deposition testimony, one of Lakeshore's officials indicated that before Lakeshore made its offer, a supervisor asked him to compare the 2005 version of the Gordian Book that the prior contractor had used on an earlier contract with the 2006 version of the Book:

Q.:     So [the supervisor] basically told you that the 2005 UPB book was low?

A.:     No, he didn't say it was low, he said that the other contractor was having difficulties executing the project, apparently, because of the spike in materials.

So what he basically asked me to do was [to] get ahold of Gordian Group to see if we can purchase the book that that contractor had, and I said yeah. So we bought it . . . and just looked page by page. Okay, here's a price, did they do anything in the book? Did any of the unit prices go up?

Q.:     Did they?

- 13 -

Even if Lakeshore's proof is sufficient to create a genuine issue of material fact as to the existence of this mistake, it has failed to provide meaningful proof as to the remaining three prongs of the mutual mistake standard. Contrary to its claims, there is no indication that the Contract presumed that all the prices in the Gordian Book were accurate. Rather, as discussed above, the Contract placed on the contractor the risk that certain prices in that book might not be accurate – a risk that was to be managed either in the calculation of the coefficient or, presumably, in assessing the desired profitability on the Contract as a whole.[17] In its bid proposal, plaintiff provided every indication that it understood this and had taken steps to assess the accuracy of the Gordian Book and approximate its impact. That those efforts were misrepresented or incomplete – or that the particular tasks assigned to plaintiff proved, for some reason, to be unprofitable – is no basis for allowing plaintiff to reform the entire contract into which it freely entered. Finally, it should not be overlooked that this fixed-price contract clearly placed the risk of any mistake regarding increased performance costs on the party seeking the reformation, *i.e.*, plaintiff. *See Lindsay v. United States*, 41 Fed. Cl. 388, 391 (1998) (no reformation where solicitation placed burden on contractors to verify estimates of work); *Foley Co. v. United States*, 36 Fed. Cl. 788, 790 (1996) (no reformation where solicitation placed burden on contractors to verify whether project was exempt from state sale tax); *see also*

---

A.:     Some did, some didn't.

Q.:     And did you create spreadsheets or documents –

A.:     It was more just –

Q.:     – regarding your analysis?

A.:     – on screen, looking at the two UPB's side-by-side and just some hand notes on some general stuff. Looked like copper went up five percent or something. It was very generic.

The official further testified that before plaintiff submitted its offer, he "compared the UPB major items that you would typically use in vertical construction," focusing, in part, on actual cost experience on past projects.

[17] Plaintiff attempts to pile a Pelion of conjecture upon an Ossa of speculation in relying on several emails it claims demonstrate that Army officials thought all the prices in the Gordian Book had been updated. These emails primarily involve an internal debate about whether to use the price book/coefficient approach. Nothing in this parol evidence has the effect of modifying the plain terms of the contract or the warnings in the Gordian Book, which, for the reasons discussed above, the court believes must be viewed as part of the Solicitation.

- 14 -

*McNamara Const. of Manitoba, Ltd. v. United States*, 509 F.2d 1166, 1168-69 (Ct. Cl. 1975).[18]
Accordingly, plaintiff does not meet any of the prongs of the mutual mistake analysis and its
claim in that regard must fail, as a matter of law.

     To make a successful claim of unilateral mistake, Lakeshore must prove: (i) that the
error is of the type that is compensable; and (ii) that the contracting officer knew or should have
known of the contractor's unilateral mistake at the time the bid was accepted. *Bromley
Contracting Co. v. United States*, 794 F.2d 669, 671-72 (Fed. Cir. 1986). Compensable claims
include any "'clear cut clerical or arithmetical error, or misreading of the specifications.'" *Id.* at
672 (quoting *Ruggiero v. United States*, 420 F.2d 709, 713 (Ct. Cl. 1970)); *see also Aydin Corp.
v. United States*, 669 F.2d 681, 686 (Ct. Cl. 1982). The Federal Circuit has clearly stated,
however, that mistakes in judgment on the part of the contractor are not the types of mistakes
that are compensable. *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed. Cir.
1987); *Bromley*, 794 F.2d at 672; *United States v. Hamilton Enters., Inc.*, 711 F.2d 1038, 1048
(Fed. Cir. 1983). And that, in the court's view, is precisely what we have here. *See Humlen v.
United States*, 49 Fed. Cl. 497, 505 (2001); *Edwards v. United States*, 19 Cl. Ct. 663, 675-76
(1990); *Carrier Corp. v. United States*, 6 Cl. Ct. 169, 175 (1984).

## III.   CONCLUSION

     The court will not gild the lily. Based on the foregoing, the court **GRANTS** defendant's
motion for summary judgment. The Clerk is hereby ordered to dismiss plaintiff's complaint.

     **IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

     [18] While plaintiff does not invoke the doctrine specifically, it appears that some of its
claims are based on what is known as the "superior knowledge doctrine." That doctrine "is a
narrow exception to the general rule that contractors in a firm, fixed-price contract assume the
risk of increased performance costs." *P&K Contracting, Inc. v. United States*, 108 Fed. Cl. 380,
395 (2012). The doctrine applies where the contractor:

> (1) undert[ook] to perform without vital knowledge of a fact that affects
> performance costs or direction, (2) the government was aware the contractor had
> no knowledge of and had no reason to obtain such information, (3) any contract
> specification supplied misled the contractor, or did not put it on notice to inquire,
> and (4) the government failed to provide the relevant information.

*GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1071
(1992) (citation omitted). But, the facts in this case make clear that plaintiff has not met this
threshold.

# In the United States Court of Federal Claims

## No. 09-865 C

**LAKESHORE ENGINEERING SERVICES, INC.,**

**JUDGMENT**

v.

**THE UNITED STATES**

Pursuant to the court's Opinion, filed April 3, 2013, granting defendant's motion for summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed.

Hazel C. Keahey
Clerk of Court

April 4, 2013            By:        s/Lisa L. Reyes

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $455.00.

ADD-2